IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | Case No: |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE: |
| | ) | |
| THE BOARD OF REGENTS OF THE | ) | |
| UNIVERSITY SYSTEM OF MARYLAND | ) | |
| 3300 Metzerott Road | ) | |
| Adelphi, Maryland 20783 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PATRICIA BRADLEY, Individually, | ) | |
| and in her capacity as Vice President | ) | |
| and then Title IX Coordinator | ) | |
| 8000 York Road | ) | |
| Towson, Maryland 12152 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ALLISON PEER, Individually, and in her | ) | |
| capacity as Deputy Title IX Coordinator | ) | |
| and Hearing Panel Chair | ) | |
| 8000 York Road | ) | |
| Towson, Maryland 12152 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DANIELLE WOODY, Individually, and | ) | |
| in her capacity as Assistant Dean of | ) | |
| Students and Hearing Panel Member | ) | |
| 8000 York Road | ) | |
| Towson, Maryland 12152 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DARIO DiBATTISTA, Individually, and | ) | |
| in his capacity as Director of Towson | ) | |
| University's Military & Veterans Center | ) | |
| and Hearing Panel Member | ) | |
| 8000 York Road | ) | |
| Towson, Maryland 12152 | ) | |

```
                                                    )
and                                                 )
                                                    )
ERICA ARRINGTON, Individually,                      )
and in her capacity as Title IX Investigator        )
Administrative Building, Room 909                   )
1000 Hilltop Circle                                 )
Baltimore, MD 21250                                 )
                                                    )
and                                                 )
                                                    )
JOHN ROES 1-5, Individually, and in                 )
their official capacities                           )
                                                    )
                 Defendants.                        )
```

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF
### (Jury Trial Demanded)

NOW COMES Plaintiff, John Doe[1], by and through undersigned counsel, Eric F. Long and

Tyler J. Walchanowicz, of Friedman Nemecek & Long, L.L.C., and Ronald L. Schwartz, of the

Law Office of Ronald L. Schwartz, and for his cause of action against the Defendants, Towson

University (through Defendant Board of Regents of the University System of Maryland), Patricia

Bradley, Allison Peer, Danielle Woody, Dario DiBattista, Erica Arrington, and John Roes 1-5

states the following:

### NATURE OF THE ACTION

1.      This action arises from unlawful gender discrimination, unlawful retaliation, and

violations of the Title IX of the Education Amendments of 1972 ("Title IX"); Plaintiff's Due

Process rights as afforded to him by the Fourteenth Amendment of the United States Constitution

and the Maryland Declaration of Rights; and breach of contractual obligations and promises by

---

[1] Plaintiff is contemporaneously filing a Motion for Permission to Proceed under Pseudonym.  Plaintiff is entitled to proceed anonymously because of the highly sensitive nature of the disciplinary proceedings against him that form the basis of this Complaint, and the fact that the University is fully aware of his identity and will not be prejudiced in any way.

Defendants. These violations and breaches resulted in erroneous findings of responsibility and sanctions against Plaintiff after he was falsely accused of violating Towson University's Sexual Misconduct Policy.

2.      After Plaintiff, a male student, was falsely accused of sexual misconduct by Jane Roe, a female student, Defendants forced Plaintiff to undergo a flawed, bias-ridden process that unjustifiably resulted in his dismissal from the University.

3.      The process utilized by Defendants is contained within the University's Code of Student Conduct, Policy on Sexual Harassment and Other Sexual Misconduct, and Policy Prohibiting Discrimination. Both on its face and as applied, these policies and procedures violated Plaintiff's Fourteenth Amendment Right to Due Process, his rights under Title IX, his rights under the Maryland Declaration of  Rights, and were a material breach of the express and implied contract that existed between Plaintiff and Towson University.

## JURISDICTION

4.      This Court has jurisdiction pursuant to 28 U.S.C §1331, 28 U.S.C. §1343, 42 U.S.C. §1983 and §1988, 20 U.S.C. §1681, et seq., and the Fourteenth Amendment to the Constitution of the United States of America. Additionally, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over state law claims that are so related to the claims within the original jurisdiction of this court that they form or are a part of the same case or controversy under Article III of the U.S. Constitution.

**VENUE**

5.     Venue is appropriate under 28 U.S.C. §1391(b).

**PARTIES**

6.     Plaintiff, John Doe, is a natural person who resides in the State of Maryland. At all relevant times, John was enrolled as a full-time, tuition paying student at Towson University.

7.     Defendant Board of Regents of the University System of Maryland (hereinafter "Board of Regents") is the governing body of all the constituents of the University System of Maryland, which includes Towson University ("Towson" or "the University") and is empowered to be sued for the actions of Towson under the statutory law of the State of Maryland. To the extent that liability is alleged against the Board of Regents, Plaintiff will refer to Defendant Board as Towson University or Towson.

8.     Towson was, at all relevant times, and continues to be a public university organized and existing under the laws of the State of Maryland.

9.     Towson receives, and at all relevant times received, federal financial assistance and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq*.

10.     Defendant Patricia Bradley was, at all relevant times to this action, an employee of Towson, serving as Title IX Coordinator. Defendant Bradley is sued in her individual capacity. Defendant Bradley is a person under 42 U.S.C §1983 and at all times relevant to this action acted under color of state law. Defendant Bradley's actions were final and support her designation as a final policy maker.

11.     Defendant Allison Peer was, at all relevant times to this action, an employee of Towson, serving as Deputy Title IX Coordinator, as well as the Chair of the Hearing Panel that erroneously found John responsible. Defendant Peer is sued in her individual capacity. Defendant

4

Peer is a person under 42 U.S.C §1983 and at all times relevant to this action acted under color of state law. Defendant Peer's actions were final and support her designation as a final policy maker.

12.     Defendant Danielle Woody was, at all relevant times to this action, an employee of Towson, serving as Assistant Dean of Students, as well as one of the Panel Members on the Hearing Panel that erroneously found John responsible. Defendant Woody is sued in her individual capacity. Defendant Woody is a person under 42 U.S.C §1983 and at all relevant times to this action acted under color of state law. Defendant Woody's actions were final and support her designation as a final policy maker.

13.     Defendant Dario DiBattista was, at all relevant times to this action, an employee of Towson, serving as Director of Towson University's Military & Veteran's Center, as well as serving as a Panel Member on the Hearing Panel that erroneously found John responsible. Defendant DiBattista is sued in his individual capacity. Defendant DiBattista is a person under 42 U.S.C §1983 and at all times relevant to this action acted under color of state law. Defendant DiBattista's actions were final and support his designation as a final policy maker.

14.     Defendant Erica Arrington was, at all relevant times to this action, an employee of Towson, serving as Title IX Investigator. Defendant Arrington is sued in her individual capacity. Defendant Arrington is a person under 42 U.S.C §1983 and at all times relevant to this action acted under color of state law. Defendant Arrington's actions were final and support her designation as a final policy maker.

15.     Defendants Roes 1-5 were at all relevant times to this action employees of Towson and they are final policymakers. Defendants Roes 1-5 are sued in their individual capacities. Defendants Roes 1-5 are persons under 42 U.S.C §1983 and at all relevant times to this action acted under color of state law.

## FACTUAL ALLEGATIONS

16.     At the time of the allegations, Plaintiff was a sophomore at Towson University.

17.     During the 2021-2022 school year, Plaintiff met Jane Roe through a mutual friend at a Superbowl Party.

18.     While at the party, Plaintiff and Jane Roe were friendly towards one another, discussing their interest in Squishmallows, a brand of collectable stuffed animals, as well as their common friends.

19.     After their initial meeting, Plaintiff communicated with Jane Roe via Snapchat.

20.     Plaintiff and Jane Roe subsequently ran into each other at the birthday party of a mutual friend.

21.     At this party, Plaintiff and Jane Roe spoke about their romantic relationships. At the time of the party, Plaintiff had just gotten out of a relationship, and Jane Roe discussed her considerations regarding ending her own romantic relationship.

22.     The conversation between Plaintiff and Jane Roe turned sexual in nature and at one point centered around choking as a sexual kink.  When choking was brought up, Jane said "don't tempt me," indicating that she enjoyed choking during intercourse.

23.     On April 13, 2022 Plaintiff was with his and Jane Roe's mutual friend, R.S.

24.     While together, Plaintiff reached out to Jane Roe via Snapchat and asked Jane Roe to hang out.

25.     Plaintiff told Jane Roe that he and R.S. were going to go to Wawa to get food. Plaintiff told Jane Roe that he could pick up Jane Roe afterwards and go to his apartment together. Jane agreed.

26.     Around 1:00 a.m. on April 14, 2022, Plaintiff arrived at Jane's apartment to pick her up.

27.     Plaintiff and Jane then drove to Plaintiff's apartment together, engaging in conversation on the way.

28.     Upon arrival to Plaintiff's apartment, he and Jane went into Plaintiff's bedroom. Upon entering Plaintiff's bedroom, Plaintiff asked Jane if she would like Plaintiff to turn on a television show. Jane replied, "yes." While Plaintiff was turning on the television, Jane made herself comfortable on Plaintiff's bed.  Once Plaintiff turned on the television, he joined Jane in bed.

29.     While in bed, Plaintiff and Jane began cuddling with each other, as she nuzzled herself against Plaintiff's body. Moments later, Plaintiff and Jane began consensually kissing each other. After a few moments of kissing, Jane stopped and told Plaintiff that she "wasn't really into it and wanted to go home." Plaintiff stopped kissing Jane and did not attempt any further physical or romantic contact with Jane. Rather, Plaintiff told Jane that she did not need to stay at his apartment if she did not want to and offered her a ride home. Jane accepted the offer for a ride back to her apartment and they left Plaintiff's apartment.

30.     While leaving the apartment, Jane remarked that she felt bad for making Plaintiff pick her up only for her to then decided that she wanted to go back home. Plaintiff told her that there was no need to apologize and he drove her home. During the car ride to Jane's apartment, the two engaged in conversation and Jane again apologized. Plaintiff and Jane arrived back at her apartment around 1:30 a.m. Upon arrival, Jane exited Plaintiff's car and went up to her apartment.

31.     After Jane went to her apartment, Plaintiff sent her a Snapchat messages saying that if she changed her mind, he was still there.  He remained in the parking lot while on his phone for

approximately 10-15 minutes.   At some point during that time frame, Jane responded and voluntarily returned to the car to come back to Plaintiff's apartment.  When she got back into his car, she stated explicitly that she wished to go back to his apartment.

32.     Upon their arrival at Plaintiff's apartment, they immediately went back into Plaintiff's bedroom. Jane entered the bedroom first, with Plaintiff following behind.

33.     Once in the bedroom, Jane turned around, facing Plaintiff, and put her hands around his neck. Plaintiff put his hands around Jane's waist. As they moved further into the room, they began kissing before falling back onto Plaintiff's bed.

34.     In Plaintiff's bed, the two continued to kiss, and began rubbing their hands over each other's bodies.

35.     Plaintiff then asked Jane to perform oral sex on him. Jane agreed. Jane helped Plaintiff remove his pants before she performed oral sex on Plaintiff.

36.     While Jane was performing oral sex on Plaintiff, Plaintiff asked Jane if she wanted him to perform oral sex on her. Jane agreed. Plaintiff then performed oral sex on Jane. During the time Plaintiff was performing oral sex on Jane, Jane removed her shirt and bra. While taking off her bra, Jane remarked that she was insecure about her breasts and asked Plaintiff not to "judge" them.

37.     Plaintiff next asked Jane if she wanted to have sexual intercourse. Jane responded affirmatively.

38.     Thereafter, Plaintiff put on a condom and began having vaginal intercourse with Jane. Plaintiff's standard practice during intercourse was to occasionally check-in with his partner to ensure that they enjoyed what was happening. His behavior towards Jane was no different.

Throughout intercourse, Plaintiff asked Jane if she was enjoying herself, and asked her if she would like him to do anything in particular.

39.     Throughout intercourse, Jane made several comments that were indicative of continued consent and she expressed her pleasure. These comments included remarking that Plaintiff had a large penis, telling him the sex was feeling "so good," and calling Plaintiff "daddy."

40.     At one point during intercourse, Jane took the gum that she was chewing and exchanged it into Plaintiff's mouth while they kissed. Plaintiff later exchanged the gum back into Jane's mouth. As intercourse continued, Jane began choking Plaintiff.   Recalling the prior conversation about choking, Plaintiff asked Jane if she enjoyed being choked during sex. Jane said yes. In response, Plaintiff put his hand on Jane's throat in a playful and erotic manner, but did not restrict her breathing or exert any real force.

41.     During intercourse, Jane also engaged in other physical acts, such as playfully slapping his face. Plaintiff asked Jane if slapping and choking was a kink of hers and Jane replied that it was.

42.     After roughly 20 minutes, Plaintiff removed his penis from Jane's vagina because of discomfort the condom was causing. After removing the condom, he reinserted his penis into Jane's vagina. Jane witnessed Plaintiff remove the condom and reinsert his penis into her. At the time, Jane did not object.

43.     After a few moments, Jane changed her mind, and asked Plaintiff to use another condom. Plaintiff immediately obliged. After getting another condom, Plaintiff asked Jane if she wished to continue, and she replied yes.

44.     The two continued to have intercourse, which concluded with Plaintiff ejaculating onto Jane, which included her torso and face. Plaintiff gave Jane a towel to clean up. The two then

put their clothes back on and Plaintiff, who needed to be at work a few hours later, told Jane that he was going to take her home. At this point, Plaintiff noticed a small change in Jane's demeanor. Plaintiff believed that Jane was slightly upset because she wished to spend the night at Plaintiff's apartment. Recognizing her disappointment, Plaintiff explained to Jane that he had to work early in the morning and it would be better if Jane went home.

45.     After leaving the apartment, Plaintiff and Jane entered Plaintiff's car and began driving back to Jane's apartment. While in the car, Plaintiff asked Jane to perform oral sex on him. Jane agreed. Jane removed her seatbelt, leaned over the center-console, pulled down Plaintiff's gym shorts, and began performing oral sex on him.

46.     When they arrived back at Jane's apartment, Plaintiff told Jane that he had a great time with her. Jane agreed but told Plaintiff that she did not want others to know what just happened between them.

47.     The next day, Plaintiff sent Jane a Snapchat stating that he hoped she was not upset at him for not letting her stay at his apartment and the awkward way the night ended. Plaintiff also sent Jane communications via Instagram. Later that night, he noticed that Jane had taken a screenshot of his message and that Jane had blocked him on Snapchat.

48.     On or about April 20, 2022, six days after their consensual sexual encounter, Jane submitted a written narrative, wherein she falsely accused Plaintiff of sexually assaulting her during the early morning hours of April 14, 2022. Jane submitted this written narrative to the Office of Inclusion and Institutional Equity.

49.     Shortly thereafter, Towson University's Title IX Coordinator, Patricia Bradley, met with Jane to review and discuss Jane's written report.

50.     After the meeting, Bradley elected to move forward against Plaintiff, on behalf of the University, with a formal report. Defendant Bradley signed a Formal Complaint against Plaintiff on April 27, 2022.  Upon information and belief, Jane Roe did not sign the Formal Complaint.

51.     On April 27, 2022, Plaintiff was notified that the University received a Formal Complaint, alleging that Plaintiff engaged in Sexual Harassment, Sexual Misconduct, or both, in violation of the University's Policy on Sexual Harassment and Other Sexual Misconduct, Towson University Policy 06-01.60. Specifically, the notice letter informed Plaintiff that Jane had accused Plaintiff of forcibly fondling her, forcibly coerced her to perform oral sex, coerced and forcibly raped her with and without a condom, sexually intimidated her with threats and physical violence to engaged in sexual intercourse and oral sex, and choked and hit her.

52.     Also on April 27, 2022, Patricia Bradley notified Plaintiff that, "as a result of the ongoing investigation… [Plaintiff was] hereby denied access to any University space or event other than the spaces where [Plaintiff met] for [his] academic courses. Beyond attending classes [Plaintiff was] unable to attend or go to any University sponsored events or residence."

53.     At all times, Plaintiff has denied, and continues to deny, that he engaged in conduct that would constitute a violation of the University's Policy on Sexual Harassment and Other Sexual Misconduct.

***The University's Polices and Procedures for Claims of Sexual Misconduct***

54.     In handling complaints of sexual misconduct, Towson University, and its employees, are mandated to follow federal law, including but not limited to Title IX of the Education Amendments of 1972 ("Title IX"), related regulations, and judicial precedent.

55.     Towson University, a state university, also must refrain from violating the Constitutional rights of its students.

56.     Defendants were also bound to follow the University's own procedures and promises, including the provisions contained in its Policy on Sexual Harassment and Other Sexual Misconduct (attached as *Exhibit A*), as well as its Grievance Procedures (attached as *Exhibit B*).

57.     Jane's complaint was governed by Towson's Police on Sexual Harassment and Other Sexual Misconduct, Policy 06-01.60 ("the Policy").

58.     Under this Policy, Towson states, among other things, that:

a.   "The University has jurisdiction over Title IX Sexual Harassment complaints when it has actual knowledge of Sexual Harassment in an education program or activity against a person in the United States. This Policy applies to all of the University's education programs or activities, whether such programs or activities occur on-campus or off-campus."

b.   "In addition to allegations of Sexual Harassment falling within Title IX jurisdiction, the University may also address allegations of Sexual Harassment and OSM (e.g., Sexual Coercion or Sexual Exploitation) under this Policy affecting its students or employees that take place outside an "educational program or activity," take place outside the United States, or otherwise fall outside Title IX jurisdiction, including, but not limited to, providing supportive measures or pursuing disciplinary action for violating this Policy."

c.   "The University may amend this Policy from time to time.  Further, the Title IX Coordinator with the approval of the General Counsel, may from time to time make revisions and updates to this Policy to comply with applicable laws, regulations and

governmental guidance and any amendments thereto. Nothing in this Policy supersedes or replaces any obligations imposed by federal law or state law and/or policy."

59.     In other words, the Policy applies equally to claims that fall under the purview of Title IX, as well as claims that do not fall under the purview of Title IX.

60.     This Policy promises to comply with applicable laws, regulations, and governmental guidance.

61.     In doing so, Towson's process of responding to and investigating claims under the Policy must comply with Title IX, as well as its implementing regulations, regardless of whether Title IX jurisdiction was met.

62.     At the time of Jane's complaint against Plaintiff, the Policy provided the definitions which were applied to the charges against Plaintiff.

63.     The Policy defines "Other Sexual Misconduct" as "prohibited behavior and conduct, including Sexual Coercion or Sexual Exploitation, which may or may not meet the definition of Sexual Harassment."

64.     The Policy defines "Sexual Coercion" as "the use of unreasonable pressure in an effort to compel another individual to initiate or continue sexual activity against the individual's will… Coercion includes but is not limited to intimidation, manipulation, threats of emotional or physical harm, and blackmail."

65.     The Policy defines "sexual assault" as "any of the following:

   a.   Forcible sex offenses – any sexual act directed against another person, without the consent of the victim including instances where the victim is incapable of giving consent, including:

    i.    Forcible Rape – The carnal knowledge of a person, forcibly and/or against that person's will or not forcibly against the person's will in instances where the victim is incapable of giving consent because of his/her temporary mental or physical incapacity;

    ii.    Forcible Sodomy – oral or anal sexual intercourse with another person, forcibly and/or against that person's or not forcibly against the person's will in instances where the victim is incapable of giving consent because of his/her temporary mental or physical incapacity;

    iii.    Forcible Fondling – The touching of the private body parts of another person for the purpose of sexual gratification forcibly and/or against that person's or not forcibly against the person's will in instances where the victim is incapable of giving consent because of his/her temporary mental or physical incapacity."

66.     The Policy defines "consent" as "a knowing, voluntary, and affirmatively communicated willingness to mutually participate in a particular sexual activity or behavior. It must be given by a person with the ability and capacity to exercise free will and make a rational and reasonable judgment. Consent may be expressed either by affirmative words or actions, as long as those words or actions create a mutually understandable permission regarding the conditions of sexual activity."

67.     When a student is alleged to have violated the Policy, the Office of Inclusion and Institutional Equity has the responsibility of administering the "Grievance Procedures" as authored and authorized by Towson University. These Grievance Procedures are available on Towson's website at https://www.towson.edu/inclusionequity/titleix/grievance-procedures.html.

68.     Section IV of the Grievance Procedures outlines the "Intake Meeting," as well as discusses supportive measures.

69.     Under the Policy, a Reporting Party may request that their name or other information be kept private and not disclosed to alleged perpetrators or that no Formal Complaint or disciplinary action be pursued to address the Sexual Harassment or Other Sexual Misconduct. However, the Policy carves out an exception that allows the University to override such a request and proceed with an investigation.

70.     Upon receiving a report of sexual misconduct, the Policy allows the Title IX Coordinator to impose supportive measures to protect the University community. The Policy required that, after an initial report of sexual misconduct, the Office of Inclusion & Institutional Equity ("OIIE") shall, as appropriate, offer and implement reasonable supportive measures to all parties, including the respondent. According to the Policy, supportive measures are not intended to be punitive nor are they intended to be permanent resolutions.

71.     The Policy provides several examples of supportive measures, which includes a "Denial of Access" to Towson University campus. Such a "supportive measure" is, by its very nature, punitive.

72.     The Policy allows for emergency suspensions for students. Specifically, the Policy states, "After an individualized safety and risk assessment, a student Responding Party may be placed on an Emergency Suspension or otherwise restricted from University Property as an Supportive Measure where the Responding Party poses an immediate threat to the physical health or safety of the Reporting Party (or any other individual) prior to the conclusion of a grievance process."

73.     Section V of the Grievance Procedures discusses the filing of a formal complaint.

74.     Per the Grievance Procedures, a formal complaint must be filed in order for the University to investigate allegations of sexual misconduct. The formal complaint may be filed by the reporting party themselves, or when appropriate, the University retains the right to initiate a formal complaint on its own, independent of the reporting party's wishes.

75.     Section VI of the Grievance Procedures discusses Permissive Dismissal. Specially, the Procedures state that, if "specific circumstances prevent the University from gathering evidence sufficient to reach a determination as to the Formal Complaint or allegations therein," the University may dismiss the Formal Complaint or any allegations therein. One such circumstance that would prevent the University from gathering evidence sufficient to reach a determination is the Reporting Party's refusal to cooperate with the investigation.

76.     Section VII of the Grievance Procedures discusses Notice of Investigation/Allegations. Specifically, Section VII states that, after receipt of a formal complaint, OIIE will provide written notice to all the parties who are known:

    a.   Of the grievance process, including any informal process;

    b.   Of the allegations of Sexual Harassment or Other Sexual Misconduct ("OSM"), including sufficient details known at the time and with sufficient time to prepare a response before any initial interview;

        i.   Sufficient details include the identities of the parties involved in the incident, if known, the conduct allegedly constituting Sexual Harassment, and the date and location of the alleged incident, if known;

    c.   Of a statement that the Responding Party is presumed not responsible for the alleged conduct and that a determination regarding responsibility is made at the conclusion of the grievance process;

d.  That the parties may have an advisor of their choice, who may be, but is not required to be, an attorney, and may inspect and review evidence;

e.  That the parties may have a support person of their choice;

f.  That knowingly making false statements or knowingly submitting false information during the grievance process is prohibited; and

g.  That if the University decides to investigate additional allegations not included in the original notice, it must provide notice of the additional allegations to the parties whose identities are known.

77.   Section VIII addresses Participation in the Grievance Procedures. In discussing the role of witnesses, the Procedures state, "anyone can be a witness if they have relevant information." In other words, individuals that do not have relevant information may not serve as a witness.

78.   Section IX discusses the Investigation. In Section IX, the University makes several promises. Specifically, the University promises that:

a.   An Investigation is an impartial, fact-gathering process. It is intended to provide the parties an opportunity to share their perspectives and identify information they believe relevant to the allegations of Sexual Harassment or OSM.

b.  The Title IX Coordinator will designate an Investigator(s) to conduct a prompt, thorough, fair, and impartial investigation. The Investigator interviews the parties and/or witnesses separately. They also gather physical evidence, such as documents, communications (including correspondence, email, text messages, social media, or other digital information), recordings (including audio and video), and other records, as appropriate and available. The Investigator is also responsible for drafting the investigative report that fairly summarizes the relevant evidence.

Case 1:23-cv-03100-ADC   Document 1   Filed 11/14/23   Page 18 of 93

c. Relevant evidence will be considered. Evidence is relevant when a reasonable person would likely accept the information as having probative value about the underlying allegations. Conversely, evidence that is not relevant will not be considered.

d. Information related to the prior sexual history of either party is generally not relevant to the determination of a Policy violation. Accordingly, the University will not use an individual's sexual history for purposes of illustrating their character or reputation. However, prior sexual history between the parties may be relevant in very limited circumstances. For example, where there was a prior or ongoing consensual relationship between the parties and where Consent is at issue, evidence as to the parties' prior sexual history may be relevant to assess the manner and nature of communications between the parties and whether Consent occurred. The Investigator will determine the relevance of prior sexual history and inform the parties if information about the parties' prior sexual history is deemed relevant.

e. At the conclusion of the Investigation, the Investigator will draft a written investigative report summarizing the relevant evidence gathered during the investigation.

f. Prior to the completion of the investigative report, the Investigator will send to each party and the party's advisor, if any, the evidence subject to inspection and review in electronic format or hard copy, and the parties will have ten (10) calendar days from the date notice is sent to submit a written response, which the Investigator will consider prior to completion of the investigative report.

g. After receipt of any written response to the evidence, the Investigator will create an investigative report that fairly summarizes relevant evidence. The investigative report will be sent in electronic format or hard copy to each party and the party's advisor, if any, for a party's review and written response at least ten (10) calendar days prior to a hearing or other time of determination regarding responsibility.

79. Section X of the Grievance Procedures outlines the Hearing Rules and Procedures. Here, the University promises that, among other things:

a. The live hearing will take place in front a Hearing Panel that will determine whether, by a preponderance of the evidence, a Policy violation occurred. The Hearing Panel will be comprised of three (3) Hearing Officers appointed by the Title IX Coordinator from a pool of trained faculty, staff, administrators, and/or outside experts, one of which shall be designated by the Title IX Coordinator as the Chair of the Hearing Panel (the "Chair"). The Chair shall facilitate the hearing; verbally exclude non-relevant questions and testimony during the hearing; and take reasonable steps to maintain order and decorum. All three (3) Hearing Officers will review the Investigative Report, along with the relevant evidence relied upon in the Investigative Report, prior to the hearing, and all will be voting members for purposes of deliberations after the conclusion of the hearing.

b. The Title IX Coordinator will provide a written Notice of Hearing to all parties simultaneously at least ten (10) calendar days prior to the hearing, which will include the purpose of the hearing, the makeup of the Hearing Panel, the participants (including witnesses), the date, time and location of any pre-hearing conference, and the date, time and location of the live hearing. Within 24 hours of

receipt of the notice, either party (not an advisor or support person) may assert to the Title IX Coordinator, in writing, that a Hearing Officer has a conflict of interest or bias. If the Title IX Coordinator determines that such a conflict or bias exists, the Title IX Coordinator will replace the Hearing Officer with an alternate from the pool. The Title IX Coordinator's decision is final.

c.  At the hearing, the parties and all witnesses will testify in the same room as the Hearing Panel or virtually. The parties will be able to view the testimony of each other and non-party witnesses either in-person or virtually as pre-determined.

d.  At the hearing, all witnesses, including the parties, are required to answer all questions on their own behalf.

e.  At the hearing, the Hearing Panel will ask the Reporting Party questions first, then the Responding Party's advisor may ask questions of the Reporting Party. The Hearing Panel will next question the Responding Party in the same manner allowing the Reporting Party's advisor to then ask questions of Responding Party. The Hearing Panel will next question each witness with an opportunity for Reporting Party's advisor and then Responding Party's advisor to question the witness. After questioning has been completed, additional follow-up questions of the parties and witnesses will only be permitted at the discretion of the Chair.

f.  At the hearing, only relevant questions will be asked of a party or witness.

g.  The purpose of allowing the parties, through their advisors, to question the other party and witnesses is to permit the parties to probe the credibility, plausibility and reliability of statements asserted by the parties/witnesses, and to provide an opportunity to bring out additional facts and details about the alleged incident(s).

advisors must engage in questioning that is relevant, respectful, non-intimidating and non-abusive.

h.  If either party or a witness fails to appear or stops participating before the conclusion of the hearing, the hearing will continue as scheduled, unless the Chair, in their sole discretion, determines the Hearing should be postponed for good cause.

i.  At the hearing, upon completion of all testimony, each party, speaking on their own behalf, shall have five (5) minutes to provide a closing statement if they so choose. The Reporting Party will speak first followed by the Respondent. No reply will be permitted.

j.  Both inculpatory and exculpatory evidence is admissible during the hearing, if such evidence is relevant.

k.  Questions and evidence about the Reporting Party's sexual predisposition or prior sexual behavior are not relevant, unless such questions and evidence about the Reporting Party's prior sexual behavior are offered to prove that someone other than the Responding Party committed the conduct alleged by the Reporting Party, or if the questions and evidence concern specific incidents of the Reporting Party's prior sexual behavior with respect to the Responding Party and are offered to prove consent.

l.  Questions and evidence about a party's prior sexual history with an individual other than a party to the proceedings are not relevant, except to: prove the source of injury; prove prior sexual misconduct; support a claim that a student has an ulterior motive; or impeach a party's credibility after that party has put his or her own prior sexual conduct at issue.

m.  The Hearing Panel may consider statements made by the parties and witnesses during the investigation, emails or text exchanges between the parties leading up to the alleged sexual harassment or OSM, and statements about the alleged sexual harassment or OSM if such evidence is relevant, regardless of whether the parties or witnesses submit to cross-examination at the live hearing. The Hearing Panel may also consider police reports, Sexual Assault Nurse Examiner documents, medical reports, and other documents if such evidence is relevant even if those documents contain statements of a party or witness who is not cross-examined at the live hearing. The Hearing Panel may not draw an inference about the decision regarding responsibility based solely on a party's or witness's absence from the live hearing or refusal to answer questions.

n.  Upon completion of the hearing, the Hearing Panel shall objectively evaluate and weigh the relevant evidence to determine the outcome based on a preponderance of the evidence and will issue a written determination that includes the finding and rationale.

o.  Where credibility of the parties is an issue in determining preponderance of evidence, the rationale will include an explanation of how the Hearing Panel resolved questions of credibility.

p.  The written determination must include, among other things:

   i.  Findings of fact supporting the determination.

80.    Section XI of the Procedures considers Sanctions and Remedies. Specifically, the University provides that, "In determining the appropriate sanction(s), the University will examine a number of factors, including, but not limited to: 1) level of risk of harm to the community; 2) the

nature and seriousness of the offense; 3) use of drugs or alcohol in the perpetration of the violation; 4) motivation underlying the Responding Party's behavior; and/or 5) the Responding Party's record of past misconduct, including prior violations of the same or similar type."

81.     Section XII of the Procedures discusses Appeals. Specifically, the University states, among other things:

a.   Either party may appeal the dismissal of a Formal Complaint or any allegations therein, and from a written determination regarding responsibility on the following grounds only:

i.   A procedural error or irregularity that affected the outcome;

ii.   New evidence that was not reasonably available at the time the determination of responsibility or dismissal was made, that could affect the outcome of the matter; and/or

iii.   The Title IX Coordinator, Investigator(s), or Hearing Officer(s) had a conflict of interest or bias for or against Reporting Parties or Responding Parties generally or individual Reporting Party or Respondent that affected the outcome.

b.   Either party may also appeal any sanction imposed in the written determination on the following grounds only:

i.   The severity or proportionality of the sanction

c.   Upon receipt of a written response, or expiration of the time to provide a written response if no response is submitted, the Title IX Coordinator will appoint a trained Appellate Officer to decide the appeal. The Appellate Officer will not be the same person as the decision-makers that reached the determination being appealed, the

Investigator(s), or the Title IX Coordinator. Though not explicitly stated, the Appellate Officer must also be free from bias or conflict of interests.

82.     Section XIII discusses the Final Outcome. Here, the University states that, "after the appeal process has concluded (or when the time for an appeal has passed with no appeal submitted, whichever is later), the Title IX Coordinator will promptly notify the appropriate University officials as well as the Reporting and Responding Parties, in writing, of the final outcome of the Formal Complaint." In other words, the outcome of the investigation, as well as any sanctions, should not go into effect until and unless a ruling on any appeals is submitted.

83.     Though the allegations Jane made against Plaintiff did not fall under the jurisdiction of Title IX, Towson was nonetheless required to follow Title IX and its implementing regulations based upon the Policy, as well as the Procedures discussed in paragraphs 57-83 above.

84.     Aside from failing to follow its own Grievance Procedures, Defendants treated Jane Roe significantly more favorably than it treated Plaintiff.

85.     Defendant Arrington was assigned to investigate Ms. Roe's claims against Plaintiff, with Arrington serving as the head investigator.

86.     Throughout the investigation, Defendant Arrington made preconceived notions as to Plaintiff's responsibility, relied on archaic assumptions, willfully ignored relevant evidence, and failed to prove or investigate obvious inconsistencies or omissions of relevant information by Ms. Roe.

87.     To support her allegations, Ms. Roe provided only a written narrative. Ms. Roe refused to participate in the investigation any further.

88.     Under Towson's Policy, "The Title IX Coordinator will designate an Investigator(s) to conduct a prompt, thorough, fair, and impartial investigation. The Investigator interviews the parties and/or witnesses separately." Under this section, sitting for an interview is required.

89.     The only witness interviewed by Towson was M.D., Ms. Roe's friend.

90.      By failing to interview Ms. Roe, Defendant Arrington never questioned her or explored her inconsistencies and behavior on the night in question, which were indicative of consent. For example, the Defendant Arrington:

    a.  Failed to explore why Ms. Roe, despite claiming Plaintiff was making her uncomfortable before picking her up and claiming that the two had been distant from one other in the previous two months, willingly kissed him shortly after entering his car,

    b.  Failed to explore why Ms. Roe falsely stated that, after asking to be taken home the first time, Plaintiff was visibly upset and "speeding the whole way back."

    c.  Failed to explore why, despite the fact that Ms. Roe claimed to have been so uncomfortable with Plaintiff's actions and despite her suspicion he was drunk, she willingly accepted rides from Plaintiff and returned to his apartment a second time.

    d.  Failed to explore why Ms. Roe claimed that immediately after getting dropped off at her apartment, she did not think she was assaulted and why she originally "brushed off" her friend's opinion that sex was nonconsensual.

    e.  Failed to interview Ms. Roe's ex-boyfriend, despite having knowledge that he had relevant information.

f.  Failed to explore why she claimed that she could barely leave her apartment because of Plaintiff, yet continued to enjoy a robust and plentiful social life, as shown on her social media accounts.

g.  Failed to take any steps to obtain relevant documents from Jane, including the results of her SANE exam, or any other documents to support her claims that Plaintiff's alleged conduct had forced her to go to therapy,

h.  Failed to explore why Ms. Roe willfully omitted the fact that she and Plaintiff had discussed sexual kinks prior to the night in question, including Ms. Roe acknowledgement that choking was one of her "kinks."

i.  Failed to explore why Ms. Roe wrote that Plaintiff ejaculated in her eye in his apartment, but told M.D. that he ejaculated in her eye in the car.

j.  Failed to explore why, despite her claim that she was just raped by Plaintiff, she jokingly texted M.D. stating "Ur gonna die," indicating that Ms. Roe had gossip she wanted to tell M.D.

k.  Failed to explore why M.D. believed it took Jane time to believe she was assaulted, after Jane appeared to initially believe that sexual activity was consensual.

l.  Failed to explore why Ms. Roe made false statements about what occurred, and the timeline of events the first time Plaintiff took her back to her apartment.

91.  Throughout the investigation, Defendant Arrington failed to treat Ms. Roe and Plaintiff equitably. Upon information and belief, Ms. Roe was promptly offered supportive measures, whereas Plaintiff was immediately removed from campus. In removing Plaintiff from campus, Defendants failed to complete an individualized safety and risk analysis that determined

an immediate threat to the physical health or safety of any student or other individual arising from the allegations justified removal.

92.    Towson's inequitable treatment continued when it expected Plaintiff to participate in the process but allowed Ms. Roe to refuse participation without repercussion.

93.    In contrast to Defendant Arrington willfully ignoring obvious inconsistencies presented by Ms. Roe, such as her behaviors throughout the night in question, which were indicative of consent, Defendant Arrington badgered Plaintiff during his interview, criticizing his narrative multiple times and insinuating that his version of events was not believable. By way of example, Defendant Arrington criticized Plaintiff for waiting outside Ms. Roe's apartment after he dropped her off the first time.

94.    Upon information and belief, Defendant Arrington never attempted to seek clarity regarding any of Jane's statements or inconsistencies.

95.    After the investigation was concluded, Defendant Arrington sent Plaintiff and Ms. Roe the evidence packet for review and response. In response, Plaintiff sent a twelve-page response to Defendant Arrington. In his response to Ms. Roe's statements, Plaintiff highlighted Ms. Roe's inconsistencies, and provided documented evidence to demonstrate these inconsistencies. For example, in Plaintiff's reply, he debunked the notion that the alleged pain Ms. Roe felt during sex was indicative of nonconsensual sex; provided potential motive for Ms. Roe to lie about Plaintiff and her sexual encounter; and debunked the notion that Plaintiff has caused Ms. Roe the pain and suffering she alleged. All of this information was relevant to the investigation, however, none of it was featured in the Final Investigative Summary Report. Instead, the University deleted and/or altered Plaintiff's response, incorporating less than half of the information he sent to the University.

96.     On July 17, 2022, after receiving the Final Report, Plaintiff notified the University of his concern that more than half of his response to Ms. Roe's statement was omitted. The University did nothing to correct this error, and instead, continued to ignore relevant evidence, and refused to permit the panel to review all relevant evidence available. Plaintiff once again attempted to introduce relevant evidence into the record. This evidence included, but is not limited to:

    a.  Further rebuttals of Ms. Roe's statements, with demonstrative evidence to support said rebuttals, such as screenshots debunking Ms. Roe's timeline as well as social media posts contradicting her claims that Plaintiff caused her mental/emotional trauma;

    b.  Evidence supporting Plaintiff's narrative of events, such as screenshots corroborating his timeline, and contradicting Ms. Roe's timeline;

    c.  Evidence demonstrating Ms. Roe's motive to make false statements, such as her ex-boyfriend being angry about her kissing Plaintiff;

    d.  Evidence demonstrating that Ms. Roe made false statements, such as screenshots from social media posts depicting Ms. Roe partying in the days/weeks after the alleged assault;

    e.  Evidence demonstrating that M.D.'s credibility was questionable, such as evidence suggesting that text messages given by M.D. had been doctored.

97.     Prior to the Hearing, Plaintiff also submitted to, and passed, a polygraph examination. In said polygraph, Plaintiff was asked whether he ever had intercourse with Jane against her will and whether Jane performed oral sex on him against her will. Plaintiff answered "no," to both questions. No deception was indicated in Plaintiff's answers.

98.     Towson's Policy states, in pertinent part, the hearing "is not a criminal or legal proceeding. Formal legal rules, including, but not limited to, any rules of evidence and procedure, are not applicable."

99.     Under the Policy, the polygraph exam results should have been considered.

100.    The exculpatory results of this polygraph exam were ignored by Defendants. Towson never provided any justification for ignoring this evidence. Upon information and belief, the results of the polygraph examination were not considered due to Defendant DiBattista's personal opinion regarding polygraph examinations.

101.    On July 18, 2022, Defendant Arrington sent Plaintiff and Ms. Roe an email containing the prospective panel members. The email instructed Plaintiff and Ms. Roe to review the list and inform the University if either party had a "personal conflict with any named panel member." The email was silent as to any other permissible objections, such as a general bias towards males or a "start by believing" attitude which may hinder a person's ability to be impartial.

102.    Under federal law, and according to Towson's own Policies and training materials, hearing panel members must be free from conflicts of interest or bias for or against complainants or respondents generally. Upon information and belief, the University took no steps in evaluating and verifying its prospective panel members, and instead, requested that Plaintiff and Ms. Roe fulfill the University's obligations to do so.

103.    The Panel consisted of Allison Peer, Director of Student Conduct and Civility Education and panel chair; Danielle Woody, Associate Director of Student Conduct and Civility Education; Dario DiBattista, Director of the Military & Veterans Center; and alternate member Stephen Willems, Accessibility & Disability Services (ADS) Specialist.

104.    At the time the University appointed Defendant DiBattista, the University knew that DiBattista was unfit to serve as an impartial panel member, as he had a proclivity of being bias against males, per his own social media accounts.

105.    DiBattista had a clear bias against Plaintiff and was predisposed to believe Ms. Roe based solely on her gender, in violation of Title IX. For example:

a.    On December 12, 2014, DiBattista tweeted, "A woman, it seems, may have lied rape but that's no reason to not support anyone else who has their own claims." *See* December 12, 2014 tweet attached hereto as *Exhibit C*.

b.    On November 17, 2017, DiBattista tweeted, "Google 'whataboutism' and consider it in the context of the current sexual assault and men of power conversation we're having." *See* November 17, 2017 tweet attached hereto as *Exhibit D*.

c.    On December 7, 2017, DiBattista tweeted, "So [Senator Franken] is all about this #metoo movement he's losing his job over." DiBattista concluded his tweet with an emoji of an eye roll. *See* December 7, 2017 tweet attached hereto as *Exhibit E*.

d.    On July 29, 2017, DiBattista tweeted, "The friend zone's a bad place, right? Sike. Friendship is awesome! Women aren't sex machines you put nice coins in until they sleep with you." *See* July 29, 2017 tweet attached hereto as *Exhibit F*.

e.    On December 3, 2017, DiBattista made a Facebook post reacting to Brock Turner appealing his rape conviction. The post read, "In MY nation, this man gets castrated and his life-time probation officer forces him to eat gobs of saltpeter for every mean for the rest of his life." *See* December 3, 2017 Facebook post attached hereto as *Exhibit G*.

f.   On July 30, 2018, DiBattista tweeted, "I think you're probably a skeezy dude if you can't get dates via apps. Amazing what happens when you just treat women like people instead of transactional sex holes." *See* July 30, 2018 tweet attached hereto as *Exhibit H*.

g.   On September 25, 2018, DiBattista tweeted, "We can disagree about lots of things. But it really says a lot about you if you're getting mad at credible women – and lets be real, someone shouldn't have to go to Yale to be 'credible' – for coming forward with claims of sexual assault." *See* September 25, 2018 tweet attached hereto as *Exhibit I*.

h.   On September 25, 2018, DiBattista tweeted, "The world's really easy when you're not a D or Rand don't view everything from the prism of "your side" and "winning." Take a step away. You're mad at women for speaking about assault and possible trauma. That's really crappy behavior. Period." *See* September 25, 2018 tweet attached hereto as *Exhibit J*.

i.   On September 26, 2018, DiBattista tweeted, "What world is it that one woman falsely accusing rape equals the vast majority of woman who are sexually assaulted and speak out about it are liars? Confirmation bias is strong, ya'll. #IBelieveYou" *See* September 26, 2018 tweet attached hereto as *Exhibit K*.

j.   On September 27, 2018, DiBattista tweeted, "Yay, my many years of bartending finally makes me a subject matter expert! You drink too many beers? There are effects! Like, not remembering things! #kavanaugh" *See* September 27, 2018 social media posts attached hereto as *Exhibit L*.

k.  On September 27, 2018, DiBattista tweeted, "Neil Gorsuch is my answer to everyone who's suddenly worried about their careers being derailed because of made-up sexual assault claims. Many people did not like him. No one made a claim. Apparently all he did was not rape. Amazing." *Id.*

l.  On September 27, 2018, DiBattista made a Facebook post regarding Brett Kavanaugh and Dr. Blasey Ford's testimony. Here, he stated, "It's so insane Dr. Blasey Ford has to go through THIS. Her description of trauma was textbook – avoidance of triggers, inability to recount the event without re-experiencing physical symptoms. I believe her. She's not on trial. Stop there." He concluded his post by writing, "Also, POLYGRAPHS don't work for ANYTHING." *Id.*

m.  On October 19, 2018, DiBattista posted on his social media account, "I'm seeing glowing tributes today about a dead man whom, I know for a fact, violently raped one of my friends. I'm adding this to the list of reasons women don't report sex crimes. When this dude dies I ordered prime rib at the restaurant he worked at. It was so good." *See* October 19, 2018 tweet attached hereto as *Exhibit M*.

    i.  In response, an unknown person asked DiBattista, "I'm trying to understand you here. Are you saying that women don't report crimes because the offenders have friends or because they have people who recall them fondly after their passing?" *Id.*

    ii.  DiBattista responded to this question by stating, "The dude was a pretty shitty guy. But no one would believe it. My point is some people who some others think are very good are actually very awful people." *Id.*

n.  On March 11, 2020, DiBattista tweeted, "I turned down an embarrassing amount of sex in the USMC because I was saving myself for the 'right one.' I wish this were a joke tweet." *See* March 11, 2020 tweet attached hereto as *Exhibit N*.

o.  On September 22, 2020, DiBattista tweeted, "Up until a month ago I was a bartender. When the pandemic is over I will do it again. I don't know what people think bartenders do? I save people from sexual assault, poisoning themselves too much, or from getting arrested or accidentally killing others pretty much every night." *See* September 22, 2020 tweet attached hereto as *Exhibit O*.

106.    For years, DiBattista has made his opinion about the veracity of female sexual assault claims well known. His opinion is that the overwhelming majority of women are truthful in their claims, as evidence by his "I Believe You" tweet. *See Exhibit K*.

107.    DiBattista's commentary on these topics were consistently aimed towards bias against males, and not simply a pro-complainant approach.

108.    This bias, as well as his own personal experience with having a friend who claims to have been sexually assaulted, rendered him unfit to serve as a panel member, as he was incapable of being fair and impartial.

109.    DiBattista did not attempt to recuse himself from the Panel, despite his clear bias and order to do so under Towson's own Policies. Rather, DiBattista willfully remained as a Panel Member, so that he could inject his bias into the proceeding, as a way to vindicate his friend and other women who claim to have been sexually assaulted.

110.    Upon information and belief, Towson took no steps to ensure that DiBattista was free from any bias.

111.     Panel Member Allison Peer appeared in a Youtube video posted by Towson. In it, Peer states,

    a.   "[Towson] also aim[s] to help students learn the value in accepting accountability when they have caused harm to themselves or others."

    b.   "Families can support their students by reminding them that their choices and behaviors can have an impact on others as well as themselves." https://www.youtube.com/watch?v=ECFJrJ1DRSM

112.     These comments suggest that Towson's student disciplinary processes and overall campus culture is centered around believing allegations and holding students accountable for mere allegations.

113.     This belief rendered her unfit to serve as a panel member, as she was incapable of being fair and impartial.

114.     Peer did not attempt to recuse herself from the Panel, despite her bias and order to do so under Towson's own Policies. Rather, Peer willfully remained as a Panel Member, so that she could inject her bias into the proceeding.

115.     During the Hearing, Defendants' bias and preconceived notions were on full display, as they treated Plaintiff as if he was already responsible from the beginning of the hearing. The hearing itself was aimed towards finding Plaintiff responsible.

116.     Towson's Title IX training, which is applicable to the proceedings at issue herein, states that it is the responsibility of the decision maker to hear from witnesses, including the parties.

117.     At the hearing Jane refused to participate and did not appear for the hearing.

118.    The decision-maker in this matter never heard from Ms. Roe. In fact, no University employee was ever given the opportunity to hear from Ms. Roe, nor were they given the opportunity to properly assess her credibility.

119.    Towson's own Policy recognizes the importance of cross-examination, especially when aimed at probing the witnesses credibility.

120.    At the hearing, Plaintiff was again given the opportunity to challenge any of the panel members. However, Plaintiff was again told that he could only raise an objection if he believed one of the panel members had a "personal" bias against him.

121.    At the hearing, it was confirmed that Defendant Arrington never had an opportunity to interview Jane. As such, the investigator was never able to observe her demeanor, ask follow-up questions, or otherwise examine her credibility.

122.    Because Jane did not attend the hearing, Plaintiff was not able to cross-examine Jane, or otherwise question the many inconsistent or false statements she made in her written statement compared to what she told others. Moreover, Defendants did not allow Plaintiff to put his cross-examination questions on record, so that the Panel could hear and/or review the questions that would have been asked of her. In doing so, the Panel provided no rationale for it decision.

123.    Because Jane refused to participate and answer questions, the Panel was also unable to observe her demeanor, ask questions, or otherwise examine her credibility.

124.    At the hearing, M.D. testified, in contradiction to the University's policies and procedures, when the hearing officer, among other things:

     a.    Allowed M.D. to offer irrelevant victim-impact statement testimony into the record;

     b.    Asked irrelevant questions regarding Jane's personality before her accusations were made;

c. Improperly allowed, and even invited, M.D. to give her own personal opinion about the veracity of Jane's claims; and

d. Improperly allowed, and even invited, M.D. to speculate on why Jane felt that it would be easier to not resist Plaintiff's advances.

125. At the hearing, the only person with first-hand knowledge of the events in question that participated was Plaintiff. During Plaintiff's testimony and opening statement, the Panel heard that:

a. Ms. Roe agreed to hang out with Plaintiff on the night in question;

b. Plaintiff and Ms. Roe kissed consensually both in Plaintiff's car and at Plaintiff's apartment;

c. Ms. Roe eventually asked to go home after 20 minutes, and Plaintiff drove her back to her apartment;

d. After dropping off Ms. Roe at her apartment, Plaintiff remained in the parking lot for several minutes, messaging with Ms. Roe. Ms. Roe changed her mind and came back to Plaintiff's car, with the intention of returning to Plaintiff's apartment;

e. Plaintiff and Ms. Roe had consensual sexual activity, which included sexual intercourse and oral sex. Ms. Roe was a willing and active participant during all stages of sexual activity.

f. At one point during sexual intercourse, Plaintiff took off his condom, which Ms. Roe witnesses herself. Plaintiff began having unprotected intercourse with Ms. Roe. After a few moments, Ms. Roe changed her mind, and asked him to put on another condom. Plaintiff immediately obliged.

g.  After sexual intercourse, Plaintiff told Ms. Roe she was not able to spend the night, as Plaintiff had to work early the next morning. Plaintiff noticed Ms. Roe become slightly upset that she could not spend the night;

h.  On the way home, Ms. Roe willingly performed oral sex on Plaintiff;

i.  Plaintiff took and passed a polygraph indicating that he did not engaged in any non-consensual sexual activity with Ms. Roe;

j.  Ms. Roe had motive to make false statements, as her ex-boyfriend was upset with her for having sex with Plaintiff;

k.  Ms. Roe made demonstrably false statements in an effort to exaggerate the story and/or make it appear as if Plaintiff was aggressive and angry at her;

l.  Plaintiff and Ms. Roe had previous conversations about sex, including her desires for rough sex.

126.  During the questioning phase of the hearing, Defendants improperly attempted to shift the burden of proof onto Plaintiff, as Defendant Woody pressed Plaintiff regarding why he believed Ms. Roe was willing to have sex with him on the night in question. Specifically, Woody asked Plaintiff what specific words were said to make Plaintiff believe he had obtained Plaintiff's consent.

127.  Verbal consent is not required under Towson's policy. Rather, under the Policy, consent may be given non-verbally, and non-verbal consent is treated the same as verbal consent.

128.  Woody continued to misconstrue the Policy by asking Plaintiff about how he gained verbal consent from Ms. Roe regarding each and every stage of sexual activity. For example, Ms. Woody asked Plaintiff if he gained consent each step of the way, and asked if Ms. Roe gave consent to having unprotected sex.

37

129.    Plaintiff answered this question by stating that Ms. Roe saw Plaintiff take off the condom and not put another condom on before inserting his penis back into Ms. Roe's vagina. Defendant Peer followed up by asking Plaintiff how many times he asked for consent, again misconstruing Towson's policy, and improperly shifting the burden of proof to Plaintiff.

130.    Next, DiBattista inserted his own personal bias into the hearing when he inexcusably asked Plaintiff why, after he dropped off Ms. Roe the first time, he "persisted" in contacting her even after she said she was not interested.

131.    There was no allegation that Plaintiff "persisted" in contacting Ms. Roe after he dropped her off and remained in the parking lot. The only evidence heard about this timeframe is that Plaintiff stayed in the parking lot and messaged Ms. Roe that if she changed her mind, he was still outside. DiBattista concluding that Plaintiff persisted in contacting her was both inappropriate and not supported by any evidence.

132.    There was no allegation that Ms. Roe told Plaintiff she was "not interested." Rather, the evidence presented at the hearing demonstrated that Plaintiff and Ms. Roe began kissing, and sometime before sexual activity occurred, she asked to be taken home. Ms. Roe never told Plaintiff she was not interested in him.

133.    DiBattista continued by asking Plaintiff how long he waited outside Ms. Roe's apartment. When Plaintiff answered, "about 20 minutes," DiBattista questioned, "You don't think that's aggressive behavior?"

134.    When Plaintiff answered that he did not believe his behavior was aggressive, DiBattista improperly argued with Plaintiff, injecting his own opinions as testimony during the hearing.

135.    During the hearing, Defendant Peer argued that Plaintiff was not being honest when he said that he never begged Ms. Roe for anything. Ms. Peer opined that waiting outside was considered "begging."

136.    Later in the hearing, Defendant Peer again questioned Plaintiff about whether Plaintiff and Ms. Roe had a verbal conversation about having sex, once again misinterpreting the Policy and improperly shifting the burden of proof onto Plaintiff.

137.    Danielle Woody asked Plaintiff if he gained explicit consent from Ms. Roe to choke her, thereby shifting the burden of proof to Plaintiff in violation of the policy.

138.    Defendant Woody next questioned Plaintiff on why he decided, "out of all places," to ejaculate on Ms. Roe's face, despite the fact that Ms. Roe never alleged that she objected to Plaintiff ejaculating on her face.

139.    Plaintiff testified that he did not purposefully ejaculate on her face.

140.    Defendant Peer then questioned Plaintiff on his request for Ms. Roe to perform oral sex while he drove her home. Specifically, Peer asked Plaintiff why he decided to ask her for oral sex, suggesting that the request alone was inappropriate.

141.    DiBattista then asked Plaintiff how he "squares away" his treatment of Ms. Roe on the night in question, with his opening statement wherein he said he treats people with respect.

142.    Upon information and belief DiBattista was not interested in whether the facts proved, by a preponderance of the evidence, that Plaintiff sexually assaulted Ms. Roe. Rather, DiBattista was committed to finding Plaintiff responsible solely because DiBattista believed that it was not appropriate or unkind for Plaintiff to ejaculate on Ms. Roe's face or ask for oral sex in the car, neither of which constitute policy violations.

143.    Throughout the course of the hearing, DiBattista routinely made faces of disgust towards Plaintiff while Plaintiff attempted to answer questions.

144.    As evidence of DiBatita's intimidation tactic, immediately after making these faces, Plaintiff became dejected in his answering, often times stuttering and apologizing to DiBattista.

145.    Throughout the hearing, DiBattista routinely manipulated Plaintiff's words and then used these manipulated words against him. For example, Plaintiff stated that after notifying Ms. Roe that she could not spend the night, Plaintiff, in retrospect noticed a small change in behavior. However, DiBattista asked Plaintiff why he would ask Ms. Roe for oral sex when he admitted that he knew she was "very upset."

146.    DiBattista later sought irrelevant information from Plaintiff when he asked Plaintiff if he had "feelings of affection" towards Ms. Roe before this night.

147.    Defendant Woody next asked Plaintiff what Ms. Roe's response was when Plaintiff asked her to perform oral sex in the car. Plaintiff responded that Ms. Roe said, "yeah, sure." Defendant Woody then remarked that her answer was only a "sure," as a way to suggest that somehow this was not "enough" consent.

148.    Near the conclusion of the hearing, DiBattista asked Plaintiff how he would rate his own judgment during the night in question, then implying that Plaintiff's judgment was not good because he could not tell in the moment that Ms. Roe was upset at the end of the night, or that poor judgment alone would somehow warrant his expulsion from Towson.

149.    DiBattista then asked Plaintiff the irrelevant question regarding what his intentions were with Ms. Roe after the night in question, assuming that the complaint was not filed.

150.    Near the end of the hearing, Allison Peer questioned Plaintiff as to how he found Ms. Roe's postings on the endometriosis Facebook group, which contradicted some of Ms. Roe's claims. In her questioning, Ms. Peer became visibly angry, telling Plaintiff that she knows the group is a private group and asking again how he found the posts. When Plaintiff responded that his mom joined the group, which she did under her own name, Peer became upset.

151.    Despite having relevant information, Ms. Roe's ex-boyfriend was never interviewed, nor was he asked to be a witness.

152.    At the hearing, Plaintiff was subjected to questioning for approximately 45 minutes.

153.    Ms. Roe was never asked a single question throughout the process.

154.    After the hearing concluded, the panel found Plaintiff responsible "Sexual Assault" as defined by the Policy.

155.    Notably, the Panel found Plaintiff not responsible for violations of "sexual coercion," "forcible sodomy," "forcible rape," and "forcible fondling."

156.    In the Outcome Letter, Defendants state that "Neither party raised any issues with respect to any conflict of interest or bias by the Hearing Panel Members for or against the Reporting Party or Respondent Party, or Reporting Parties or Responding Parties, generally." Plaintiff was never told that he could raise an objection based on general bias. Rather, Plaintiff was told that he may only raise concerns if he believed a panel member had a specific bias or conflict of interest with him specifically.

157.    Nothing in Towson's Policy places the burden on the parties to eliminate bias and conflict of interest from the panel. Instead, Towson's Policies and training materials places the burden on the University and the panel members to eliminate bias and conflict of interest from the panel.

158.    The Outcome Letter acknowledges that Ms. Roe's refusal to participate in the process made assessing her credibility challenging, as Defendants were not able to hear testimony, assess her demeanor, or ask questions.

159.    The Outcome Letter, despite Ms. Roe's refusal to participate, bolstered her credibility because:

    a.   She provided extensive detail in her written testimony including purported quotes of conversation or statements made during the incident;

    b.   Her written statement aligned with her statement featured in the Baltimore County Police Report;

    c.   M.D. corroborated that Ms. Roe told Plaintiff, before meeting with him, that she had no desire to have sex with him the night in question and corroborated that Ms. Roe disclosed the details of the night to her right after it occurred; and

    d.   Text messages sent after the incident by Ms. Roe corroborated her written testimony.

160.    The Outcome Letter next states that M.D. was present at the hearing and credible, despite the fact she had no first-hand knowledge of the events in question. Rather, Defendants relied heavily on her testimony that Ms. Roe's demeanor had changed after the night in question.

161.    Regarding Plaintiff's credibility, the Outcome Letter states, "Responding Party attended the Hearing and answered questions from the panel. While his testimony was generally aligned with the statements he gave in the investigative report, the Hearing Panel found that Responding Party's overall credibility was called into question by his description of himself as a "nice guy" and saying that he didn't want the Reporting Party to feel like he was using her for sex when he told her she couldn't spend the night. The Hearing Panel found this self-description to be

42

inconsistent with several of his actions: (1) his admission that he believed he and Reporting Party would engage in a "one night stand" before the incident began, (2) the fact that he chose to ejaculate on Reporting Party's face after admittedly asking where he could ejaculate and hearing her response of "anywhere", and (3) moments after he thought that he upset Reporting Party by telling her to leave his apartment following sex, he then admittedly asked her to perform oral sex on him."

162.    Defendants acknowledge Plaintiff was consistent in his story, but ultimately, the Panel did not think he was a nice guy so they determined that he was not credible.

163.    Having a one-night stand is not a policy violation.

164.    Uncontested evidence at the hearing established that Plaintiff did not "choose" to ejaculate on Ms. Roe's face. Plaintiff stated at the hearing that he was positioned between her legs when he ejaculated. Plaintiff further clarified that, while some of it landed on her face, there was ejaculate on her chest as well.

165.    Ejaculating on a sexual partner's face is not a policy violation.

166.    Asking another to perform oral sex, regardless of whether they are upset or not, is not a policy violation, nor does it call a person's credibility into question.

167.    The Outcome Letter was silent as to the credibility issues of Ms. Roe, including, but not limited to:

    a.  Roe refusing to produce the results of her SANE examination, opting instead to only produce a letter stating one was performed.

        i.  Rather, the Outcome Letter stated the letter regarding the SANE examination were given little to no weight. However, this ignores the fact that Ms. Roe refusing to submit the results of the examination casts doubt on her credibility.

43

b.  Ms. Roe's sarcastic text message of "ur gonna die" to her friend, moments after allegedly being violently raped, suggesting that Ms. Roe sought to gossip about what just occurred, rather than make any allegations of rape;

c.  The demonstrative evidence produced by Plaintiff highlighting that Ms. Roe's claims that she could barely leave her apartment because of Plaintiff's attack was false;

   i.  Rather, the Outcome letter stated that documents regarding Ms. Roe's mental health, which directly contradicted Ms. Roe's statements as well as M.D.'s testimony, were not given great weight. The Panel stated that the social media posts were not given significant weight because without an expert to testify on their relevance, the Panel was unable to see how they connected to Ms. Roe's mental health.

   ii.  Plaintiff produced these social media posts not to discredit Ms. Roe's diagnosis, but rather to highlight her false statements that after the night in question, she could barely leave her apartment.

   iii.  The Panel used Ms. Roe's behavior after the night in question to bolster her credibility, while ignoring and/or refusing to give weight to evidence that directly contradicted these claims.

d.  The demonstrative evidence produced by Plaintiff establishing that Ms. Roe was exaggerating her story to make it appear as if Plaintiff was angry when taking her home the first time;

e.  The fact that something Ms. Roe said to her ex-boyfriend caused him to believe that Ms. Roe's sexual conduct with Plaintiff was consensual;

f.   Ms. Roe originally believing the sex was consensual;

g.   Ms. Roe's inconsistent statements of when Plaintiff ejaculated in her eye;

h.   The fact that, despite reporting this event to the police, no charges were ever pressed.

   i.   In the Outcome Letter, the Panel noted that this fact was given little to no weight because the Hearing here is evaluated under the preponderance of the evidence, rather than the standard used in criminal cases – beyond a reasonable doubt.

   ii.   The decision to charge someone with a crime does not use the standard beyond a reasonable doubt.

i.   The fact Ms. Roe was not willing to consent to be interviewed by the investigators, to testify before the hearing panel to allow the panelists to directly evaluate her credibility, or to subject herself to cross-examination.

168.   The Outcome Letter was silent as to the number of factors that strengthened Plaintiff's credibility. Instead, these items were willfully and improperly ignored. These items include, but are not limited to:

a.   The fact that Plaintiff, like Ms. Roe, provided extensive details in his testimony, including exact quotes of conversation or statements made during the incident;

b.   Plaintiff's polygraph test, which demonstrated that Plaintiff was being truthful in saying that he never had intercourse with Jane against her will and Jane never performed oral sex on him against her will;

c.   The fact that Plaintiff's narrative remained the same throughout the process, and that his narrative aligned with the evidence he produced;

d.  The fact that Plaintiff was willing to subject himself to cross-examination, even in light of the clear bias and attempted bullying tactics by DiBattista and the other Panel Members.

169.  The decision letter was silent as to why the hearing panel ignored relevant evidence, or why Ms. Roe's ex-boyfriend, who believed Ms. Roe had consensual sex with Plaintiff based on a post-incident conversation with Ms. Roe, was never contacted.

170.  The Panel and Defendant Arrington started with an assumption that Ms. Roe was telling the truth; selected and interpreted evidence with the goal of supporting that assumption; disregarded other facts contradicting Ms. Roe's claims; claimed to be relying on corroborating evidence but instead based findings on speculation, personal belief and biases, and mischaracterization of evidence; shifted the burden on Plaintiff to refute Ms. Roe's claims; denied Plaintiff the opportunity to have his case heard in front of impartial decisionmakers; and found Plaintiff not-credible based on illogical personal beliefs culminating in their finding that he was purportedly not a "nice guy."

171.  However, because the facts and evidence did not support a finding of responsibility, in that all facts and evidence supported the conclusion that Plaintiff and Ms. Roe engaged in consensual sexual activity, Defendant Panel Members were selective in relying on certain evidence combined with their opinions and bias to find Plaintiff responsible.

172.  Regarding the "sexual coercion" charge, the Outcome Letter stated, "The Hearing Panel was unable to substantiate the allegation of 'Sexual Coercion.' While the Reporting Party described that Responding Party repeatedly requested sexual activity and she finally gave in, Responding Party denied those actions. Based on an evaluation of all available information, the Hearing Panel did not find enough evidence to substantiate a finding based on a preponderance of

the evidence that Responding Party used "unreasonable pressure in an effort to compel another individual to initiate or continue sexual activity against the individual's will."

173.    In other words, the Panel found that the facts and evidence available did not support Ms. Roe's sexual coercion claims.

174.    Regarding the allegation of "Forcible sodomy," the Panel concluded that they were "unable to substantiate the allegation of 'Forcible Sodomy.' While Reporting Party alleged that Responding Party forced her to perform oral sex without her consent, Responding Party denied these claims and indicated that he verbally gained affirmatively communicated willingness to participate throughout both touching and oral sex. Without the presence of the Reporting Party to fully assess her credibility or gain more details about her allegation, the Hearing Panel concludes that the facts presented do not support a preponderance of the evidence regarding the allegation of 'Forcible Sodomy.'"

175.    The Panel found that the facts and evidence available did not support Ms. Roe's forcible sodomy claims.

176.    Regarding Ms. Roe's claims for "Forcible Rape" and "Forcible Fondling," the Outcome Letter stated, "Reporting Party stated she told Responding Party that she did not want to engage in sex and that the Responding Party assured her it would be fine because he would wear a condom. Responding Party denies that Reporting Party did not want to engage in sexual intercourse, but he does not deny that he told the Reporting Party that he would wear a condom and admitted during the Hearing that he always puts on a condom before sexual intercourse. Responding Party further testified during the Hearing that while he began vaginal sexual intercourse using a condom, at some point he stopped vaginal penetration because his penis was hot due to friction. At that time, he testified he removed the condom and resumed penetrating the

Reporting Party's vagina with his penis without a condom. Although Responding Party stated that he believes that Reporting Party saw him remove the condom before resuming penetration without one, he stated that he did not have a conversation with Reporting Party to obtain consent to have unprotected sex prior to re-engaging in sexual intercourse without a condom. Responding Party also admitted that after engaging in unprotected sex for about one minute, the Reporting Party specifically asked him to stop and put a condom on. This is further evidence Responding Party never obtained knowing, voluntary, and affirmative consent from Reporting Party to engage in sexual intercourse without a condom. Based on his own admissions during the hearing and his report of the events that occurred, the Hearing Panel finds by a preponderance of the evidence that Responding Party failed to obtain 'knowing, voluntary, and affirmatively communicated willingness to mutually participate in a particular sexual activity or behavior' – unprotected sexual intercourse and the touching of Reporting Party's vagina with his penis without a condom – prior to engaging in unprotected sexual intercourse a for the purpose of his sexual gratification. The Hearing Panel further concluded that, by a preponderance of the evidence, Responding Party's actions meet the Policy definitions of 'Forcible Rape' (Responding Party had carnal knowledge of the Reporting Party against her will by engaging in unprotected sexual intercourse without the Reporting Party's consent) and "Forcible Fondling" (Responding Party touched the private body parts of Reporting Party for the purpose of sexual gratification against that person's will by touching her vagina with his unprotected penis without Reporting Party's consent) and thereby the Hearing Panel finds Responding Party responsible for 'Sexual Assault' as defined by Policy."

177.    The Panel's ruling suggests that it found that Plaintiff obtained Ms. Roe's consent to engage in protected sexual intercourse, but did not obtain consent to engage in unprotected sexual intercourse.

178.     In this ruling, the Panel grossly misrepresented the facts presented at the hearing, as well as the Policy.

179.     Throughout the Outcome Letter, the Panel continued to base its decision on whether Plaintiff violated the subject policies, based on whether he obtained verbal consent from Ms. Roe to engage in each and every stage of sexual activity.

180.     The Panel remarked that they were unable to substantiate Ms. Roe's claims of "forcible sodomy" because Plaintiff indicated he verbally gained affirmatively communicated willingness to participate.

181.     Conversely, the Panel remarked that Plaintiff did not have a conversation regarding unprotected sex with Ms. Roe.

182.     Verbal consent is not required under the Policy. Rather, the Policy explicitly states, "Consent may be expressed either by affirmative words **or actions**, as long as those words or actions create a mutually understandable permission regarding the conditions of sexual activity.

183.     At the hearing, Plaintiff confidently stated that Ms. Roe saw him take off the condom, and saw that he did not put a new condom on before inserting his penis into Ms. Roe's vagina. Ms. Roe confirmed in her written statement that she saw him take the condom off. Despite this undenied observation, Ms. Roe did not state any objection. Instead, she told Plaintiff that she didn't know if he was clean. After telling Ms. Roe he was clean, Ms. Roe allowed Plaintiff to continue intercourse. After a few moments, Ms. Roe asked him to stop and put on a new condom.

184.     The Policy also recognizes that consent can change in an instance. For example, the Policy states that consent can be withdrawn at any time.

185.    The evidence presented at the hearing overwhelmingly supported the conclusion that Ms. Roe witnessed Plaintiff take off the condom and prepare to begin engaging in unprotected sex.

186.    Ms. Roe consented by her actions and her active participation in the sexual conduct. Then, after a few moments, Ms. Roe asked Plaintiff to put another condom on, again indicating her understanding that there was no condom being used for a brief period of time. Upon her withdrawal of consent to have unprotected sexual intercourse, Plaintiff immediately stopped.

187.    The Panel erroneously concluded that this conduct constitutes a policy violation.

188.    Moreover, there was never any allegation that Ms. Roe required that Plaintiff wear a condom. Rather, the evidence supports a conclusion that it was *Plaintiff's* idea to wear a condom at the beginning of intercourse. As such, there was never any prior indication to Plaintiff that Ms. Roe would object to unprotected intercourse.

189.    Under the Policy, the sole burden of proof is on the University to demonstrate that Plaintiff engaged in a policy violation, by a preponderance of the evidence. By forcing Plaintiff to demonstrate that he obtained verbal consent (which was not required under the Policy), the University improperly shifted the burden of proof onto Plaintiff.

190.    As a result of the University's erroneous finding, Plaintiff was suspended from the University through the Spring 2024 Semester.

191.    After the hearing, Plaintiff was notified by the State's Attorney for Baltimore County was declining to move forward with charges against Plaintiff regarding the exact same allegations by Ms. Roe.

192.    The decision of the State's Attorney is relevant evidence regarding the veracity of Ms. Roe's claims, or at the very least, the weight of the evidence behind her claims.

193.    Towson's Policy explicitly allows for police reports to be considered.

194.    In fact, the police report Ms. Roe filed was explicitly used by the panel members to bolster Ms. Roe's credibility.

195.    The official decision not to move forward with criminal charges is akin to a police report.

196.    The decision not to charge Plaintiff is a direct reflection of Ms. Roe's credibility and the weight of the evidence against Plaintiff.

197.    Towson University should have considered this evidence. However, it explicitly refused to do so.

198.    Plaintiff filed an appeal pursuant to the Policy, and his appeal was denied on October 12, 2022. His appeal decision was signed by Defendant Barker.

199.    Contrary to the University's Policy, the Appeals Panel and Defendant Brown refused to acknowledge or correct the Investigator and Hearing Panel's material procedural errors and the erroneous outcome, and did not address Plaintiff's specific arguments and evidence.

***Towson University's Culture of Discrimination Against Males***

200.    The University officials involved in this matter started with a presumption that Plaintiff was responsible. This is consistent with the approach the University promotes, which ensures "survivors" that its police officers "start by believing." https://www.towson.edu/public-safety/police/report-crime/

201.    The unlawful, differential, and discriminatory treatment was based on a deeply rooted atmosphere and culture at Towson University in discriminating against males in the student disciplinary process, and assuming that males are common perpetrators of sexual misconduct.

202.    Towson University guarantees that its Panel Members, and any employee/student associated with the disciplinary process receives the appropriate training.

203.    Towson University, in accordance with federal law, posts this training on its website. https://www.towson.edu/inclusionequity/titleix/

204.    Towson University's training materials are centered around the belief and assumption that males are the perpetrators of sexual misconduct.

205.    The examples and photos contained within Towson's training PowerPoint promotes the discriminatory assumption that males commit and are guilty of sexual misconduct.

206.    Contained within the PowerPoint are various photographs that provide examples of what sexual misconduct may look like. Within these examples are photographs of:

    a.  A man staring at a woman with a grin on his face with a bullet point list of forms of sexual harassment;

    b.  A sexual harassment slide that features a picture of a man putting his hand on a woman's shoulder;

    c.  A sexual assault slide that features a picture of a woman holding a "No Means No" sign;

    d.  A domestic violence slide that features a woman in a state of distress, presumably due to being a victim of domestic violence;

    e.  A dating violence slide that features a picture of a women in a state of distress, presumably from being the victim of dating violence;

    f.  An explicit bias slide that features an example of explicit bias against women. Specifically, "I don't think a woman would make a good CEO... Women are too emotional.";

g.  An implicit bias slide that features an example of implicit bias against women, which states, "Assuming that a woman entering a hospital room is a nurse instead of a doctor because of her gender.";

h.  A sanctions slide that features a picture of a man carrying a box of his belongings, presumably after being punished;

i.  A witness slide where both the fact witness and expert witness are women;

207.    These training materials create a culture where females are to be believed, males are not to be believed, males are the perpetrators of sexual misconduct, and women are the victims of sexual misconduct.

208.    Towson University's OIIE's website encourages various Towson programs aimed at preventing sexual violence and offering resources.

https://www.towson.edu/inclusionequity/titleix/sexualviolence/

209.    These programs encourage the members of the Towson University community, including employees, to support survivors, which in turn, encourages the community to start by believing.

210.    For example, the "Tigers Respect" program states that Towson is committed to ending sexual violence and creating a community that supports victims and survivors. *Id.*

211.    The "Tigers Reach Out" program encourages members to seek support if you or someone they know experiences sexual violence.

https://www.towson.edu/inclusionequity/titleix/sexualviolence/reachout.html

212.    Contained withing the Tigers Reach Out webpage are instructions on how to support survivors. Here, the webpage encourages community members to, "Believe. People rarely make up stories about sexual violence. Don't express skepticism or ask them to prove what they

endured. Remember that there is a wide range of responses to sexual violence. It is normal to be confused or conflicted." *Id.*

213.    The encouragement to believe allegations of sexual misconduct extends to Towson's OIIE's social media pages.

214.    On April 16, 2019, the OIIE tweeted, "HOW TO SUPPORT A STUDENT. Listen and believe them, you do not need to Investigate the matter. You can empower the student by connecting them to resources."

215.    On April 27, 2019, the OIIE tweeted, in part, "How Do you help a Friend? Listen. Believe."

216.    Defendants as a whole adopted the beliefs set forth by the OIIE. These beliefs include:

    a.   Sexual violence allegations are rarely made up;

    b.   Men are typically the perpetrators of sexual misconduct;

    c.   Women are the victims of sexual misconduct; and

    d.   People, including Towson staff, must start by believing.

217.    These discriminatory beliefs led Defendants to:

    a.   Ignore Ms. Roe's credibility issues, including her willful omissions of relevant information, her motive to make false statements about the alleged assault, and her documented inaccuracies/exaggerations;

    b.   Ignore their own admissions that they could not reasonably weight Ms. Roe's credibility because she refused to cooperate in the investigation or appear for the hearing;

c.  Ignore and/or give little to no weight to relevant information and/or evidence produced by Plaintiff, all of which either strengthened his own credibility or casted serious doubt on Ms. Roe and M.D.'s credibility;

d.  Engage in several material procedural irregularities, all of which benefitted Ms. Roe;

e.  Impanel a hearing panel that was demonstrably bias against Plaintiff; and

f.  Erroneously conclude that Plaintiff was responsible for violations of the Policy.

<u>**COUNT I**</u>

**Discrimination in Violation of Title IX of the Education Amendments of 1972
(Against Towson University for monetary damages and injunctive relief)**

218.  Plaintiff repeats and realleges each and every allegation set forth above as if fully rewritten herein.

219.  Defendant's disciplinary proceedings against Plaintiff, as detailed above, violated Title IX of the Education Amendments of 1972 and/or subsequent regulations.

220.  Defendant discriminated against Plaintiff and deprived him of the benefits of its education program through its discriminatory, gender-based implementation of its disciplinary process, by implementing a bias-ridden and unfair disciplinary process against Plaintiff and by expelling him as a result of that process.

**A.  Starting in 2011, the federal government pressured educational institutions to provide more protection to students alleging sexual assault, focusing on protection of women.**

221.  In the years leading up to the incident in question, colleges in the United States, including Towson University, have been subjected to pressure from the federal government, the public, and members of college communities to take campus sexual misconduct more seriously, provide more protection to purported victims, and crack down on purported offenders.

222.    On April 4, 2011, the Office for Civil Rights ("OCR") issued a "significant guidance document" commonly referred to as the 2011 "Dear Colleague Letter." Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights (Apr. 4, 2011) at n.1, available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (hereinafter "2011 Dear Colleague Letter").

223.    Although the letter marked a substantial change in OCR's position on how schools should handle disciplinary proceedings under Title IX, OCR did not conduct the public notice and comment process required for proposed regulations. See Administrative Procedure Act, 5 U.S.C. § 553.

224.    The press release announcing the letter stated that it was "the first specifically advising schools, colleges and universities that their responsibilities under Title IX include protecting students from sexual violence," and that it included "new steps to help our nation's schools, universities and colleges end the cycle of sexual violence on campus." The press release made clear the focus was on protecting women: it stated that despite past progress "the threat of violence and abuse continues for a new generation of women"; it lauded the "unprecedented coordination and cooperation across the federal government to combat violence against women"; it stated that one in five women "will be a victim of sexual assault during college"; and it highlighted "the Administration's commitment to raising awareness and promoting policies to prevent sexual violence against women of all ages." *Vice President Biden Announces New Administration Effort to Help Nation's Schools Address Sexual Violence (Apr. 4, 2011),*

https://www.ed.gov/news/press-releases/vice-president-biden-announces-new-administrationeffort-help-nations-schools-ad.[2]

225.    The 2011 Dear Colleague Letter itself explicitly focused on protection of women, repeating the claim that "about 1 in 5 women are victims of completed or attempted sexual assault while in college" and stating that "the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol." *2011 Dear Colleague Letter* at 2 & n.3.

226.    The 2011 Dear Colleague Letter reaffirmed in principle that both accusers and accused have the right to have a prompt and equitable resolution, including the right to an adequate, reliable, and impartial investigation; similar and timely access to any information that will be used at the hearing; and adequately trained factfinders and decision makers.  *Id.* at 9-11.

227.    The letter also, however, contained other provisions which expanded the nature and scope of schools' responsibility to address sexual misconduct, essentially compelling them to choose between fundamental fairness for students and continued federal funding. These provisions are not required by Title IX and are not consistent with legal precedent.

---

[2] The "one in five" "statistic," regularly cited by government officials and many others as the basis for government policy decisions, disciplinary processes, training materials, and advocacy efforts, has been thoroughly discredited. E.g.        https://www.washingtonpost.com/news/fact-checker/wp/2014/05/01/one-in-five-women-in-college-sexually-assaulted-the-source-of-this-statistic/;    https://www.washingtonexaminer.com/no-1-in-5-women-have-not-been-raped-on-college-campuses
http://www.slate.com/articles/double_x/doublex/2015/09/aau_campus_sexual_assault_survey_why_such_surveys_don_t_paint_an_accurate.html.  The Bureau of Justice Statistics' National Crime Victimization Survey reports a much lower rate of sexual assault: 6.1 per 1000 female students from 1995 to 2013, with the rate trending downwards. https://www.bjs.gov/content/pub/pdf/rsavcaf9513.pdf. Similarly, advocates for reported victims often suggest false accusations of sexual assault are rare. These claims, too, have been disputed, have been undermined by some high-profile cases, and do not appear to take into account the wide spectrum of situations in which complaints can be made. But regardless of the accuracy of these claims, the decision in any particular case should be based on the facts of that case, objectively and fairly assessed. One sexual assault is too many; one false accusation is too many.

228.    Among other things, the 2011 Dear Colleague Letter directed schools to ensure "steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant" (*id.* at 12); directed schools to take interim steps to protect complainants and "minimize the burden on the complainant" (*id.* at 15-16); "strongly discourage[d]" schools from allowing cross-examination of parties (*id.* at 12); and urged schools to focus on victim advocacy (*id.* at 19 n.46).

229.    The 2011 Dear Colleague Letter also stated that schools "must use a preponderance of the evidence standard (i.e., it is more likely than not that sexual harassment or violence occurred)," and must not use the "clear and convincing standard (i.e., it is highly probable or reasonably certain that the sexual harassment or violence occurred)." *Id.*

230.    Given the fact that campus disciplinary proceedings lack key procedural protections provided in court litigation (including discovery, the right to active representation by counsel, rules of evidence, and independent judges and juries to make decisions), the existence of other governmental and public pressure discussed in more detail below, and the severe and lasting consequences of a finding of responsibility for sexual misconduct, the preponderance standard does not adequately protect accused students' rights.

231.    Even though the 2011 Dear Colleague Letter purports to be a "guidance" document and did not go through rulemaking procedures, OCR framed many of its directives, including the directive to use the preponderance of the evidence standard, as mandatory.

232.    Moreover, the 2011 Dear Colleague Letter contained an explicit threat to colleges and universities: "When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation."  Id. at 16.

233.    The overriding purpose of the 2011 Dear Colleague Letter was "to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response," and OCR "demand[ed] that universities do so or face a loss of federal funding." *Doe v. Brandeis Univ*., 177 F. Supp. 3d 561, 572 (D. Mass. 2016). As the *Brandeis* court observed, while "[t]he goal of reducing sexual assault, and providing appropriate discipline for offenders, is certainly laudable," the effect of the letter was "the elimination of basic procedural protections—and the substantially increased risk that innocent students will be punished." *Id.*

234.    The 2011 Dear Colleague Letter has been described as the "first warning shot" that OCR intended to punish any school that failed to handle sexual misconduct proceedings as OCR wanted.  *See How Sexual Assaults Came to Command New Attention*, NPR (Aug. 13, 2014), https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention

235.    After the 2011 Dear Colleague Letter, the federal government continued to pressure colleges to deal aggressively with reported sexual misconduct, to adopt procedures that do not safeguard the rights of the accused, and to train officials to start with the presumption that an accused student is responsible, all with a focus on protection of women.

236.    In 2014, OCR released additional guidance in which it reiterated many of the directives set forth in the 2011 Dear Colleague Letter, including the directive to "ensure that steps to accord any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant."  In addition, OCR advised schools to give employees and students "trauma-informed" training and said "hearings should be conducted in a manner that

does not inflict additional trauma on the complainant." Questions and Answers on Title IX and Sexual Violence, https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

237.    The same year, a White House Task Force was created, co-chaired by the Office of the Vice President and the White House Council on Women and Girls. The Task Force continued the government's focus on protection of women, with a mission "to tell sexual assault survivors that they are not alone" and "help schools live up to their obligation to protect students from sexual violence." *Not Alone: The First Report of the White House Task Force to Protect Students From Sexual Assault*, at 2, https://www.justice.gov/ovw/page/file/905942/download.

238.    The Task Force's first report opened with the claim that "[o]ne in five women is sexually assaulted in college," stated that the federal government was ramping up Title IX enforcement efforts, and stressed again that schools found in violation of Title IX risked losing federal funding. *Id*. at 2, 17.

239.    Among other things, the Task Force supported the use of a single investigator model, which generally involves one school official serving as investigator, prosecutor, and decisionmaker and severely limits the respondent's ability to challenge the complainant's account.  *Id*. at 3, 14.

240.    The Task Force also pressed colleges and universities to provide "trauma-informed" training for their officials, stating that "when survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable." *Id*. at 3.

241.    The report stated that the Justice Department, through its Center for Campus Public Safety and its Office on Violence Against Women, was developing trauma-informed training programs. *Id*.

242.    Ultimately, the Department of Justice funded a "Start by Believing" campaign under which investigators are trained to investigate cases from an initial presumption of guilt and write reports "that successfully support the prosecution of sexual assault cases." *End Violence Against Women International, Effective Report Writing: Using the Language of Non-Consensual Sex*, at 6, http://evaw.threegate.com/Library/DocumentLibraryHandler.ashx?id=43; *see also Campus                Action                Kit,                Start                by                Believing*, https://www.startbybelieving.org/wpcontent/uploads/2019/08/Campus-Action-Kit.pdf.

243.    Among other things, "Start by Believing" training directs investigators to:

    a.    "recreate the entire reality of the sexual assault <u>from the perspective of the victim</u>";

    b.    focus on evidence and statements that "corroborate the victim's account";

    c.    include details not just about what happened, but about "what the victim was thinking and feeling," in order to create a "word picture" that "better support[s] prosecution";

    d.    "replace neutral words such as 'said,' 'told,' or 'asked'" with more "descriptive" words – e.g., say the "victim" "begged" or "pleaded," and the "suspect" was "ordering," "insisting," or "demanding";

    e.    "describ[e] all of the elements that contributed to the victim's experience of force, threat, or fear";

    f.    "<u>always use the language of non-consensual sex</u>"; i.e., instead of "terms that convey positive, mutual interactions such as 'sexual intercourse' [or] 'oral sex,'" "it is sometimes appropriate to use terminology from the penal code, such as 'rape' or 'sexual assault,'" or, alternatively "simply describe the parts

of the body and the things the victim was forced to do with those parts of the

body";

g.  "highlight implausible, absurd, and/or changing explanations provided by the

suspect regarding what happened";

h.  "try to anticipate potential defense strategies and include the evidence and

information necessary to counter these strategies"; and

i.  "ensure that . . . reports include all of the evidence required to prove the

elements of the offense and refute the likely defense, which in most sexual

assault cases is going to be consent."

*Effective Report Writing: Using the Language of Non-Consensual Sex*, at 5, 7, 8, 10, 11, 12, 14,

23, 30 (emphasis original).

244.    In sum, "Start by Believing" training tells investigators: "By writing the report to

recreate the reality of the sexual assault and refute potential defense strategies, investigators can

greatly increase the likelihood that charges will be filed in the case and it will result in a

conviction. They may even help to make this process faster, smoother, and easier for the victim

than it would otherwise be. As one experienced prosecutor summarized, 'a well-written report

can make a jury trial into a bench trial and a bench trial into a guilty plea.'" *Effective Report

Writing: Using the Language of Non-Consensual Sex*, at 37.

245.    In February 2014, Catherine E. Lhamon, then the Assistant Secretary of

Education and head of OCR, told college officials attending a conference that existing practices

for handling sexual misconduct complaints send a message "that victimized students are worth

less than the people who assault them"; that school officials and she as "chief enforcer" needed

to "radically change that message"; and that "if you don't want to do it together, I will do it to

you." *Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases*, Chronicle of Higher Education (Feb. 11, 2014), https://www.chronicle.com/article/Colleges-Are-Remindedof/144703.

246.    According to the Chronicle of Higher Education, college officials understood they had been given "crisp marching orders from Washington" to follow OCR's directives. *Id.*

247.    On May 1, 2014, as part of its aggressive enforcement policies following the 2011 Dear Colleague Letter, OCR published a list of 55 higher education institutions nationwide that were then under investigation for possible Title IX violations. *U.S. Department of Education Releases List of Higher Education Institutions with Open Title IX Sexual Violence Investigations* (May 1, 2014), https://www.ed.gov/news/press-releases/us-department-education-releases-listhigher-education-institutions-open-title-ix-sexual-violence-investigations.

248.    According to the Chronicle of Higher Education, that number eventually grew to over 500. *Title IX, Tracking Sexual Assault Allegations,* Chronicle of Higher Education, https://projects.chronicle.com/titleix/.

249.    The sharp increase in the number of investigations – the overwhelming majority of which have involved alleged violations of the rights of complaining students, almost always female – was accompanied by increases in the scope of OCR's investigations, in findings that schools had violated Title IX, and in the imposition of punitive measures as a result.

**B. In response to government and public pressure, colleges and universities across the nation have adopted Title IX policies and procedures that are "victim"-centered and fundamentally unfair to accused students.**

250.    The threats and pressure from OCR have forced colleges and universities to change their policies, since virtually all colleges and universities in the country receive federal funding.

251.    In response to the federal government's directives and enforcement activities, schools across the nation have adopted special policies for disciplinary proceedings involving alleged sexual misconduct. The policies are administered by designated officials and include investigatory and decision-making processes, evidentiary standards, and appeal processes based on OCR's actual and perceived requirements. In many instances, the policies and processes offer accused students significantly less protections than students receive in other campus disciplinary matters, including matters involving allegations of serious non-sexual misconduct.

252.    In their policies for adjudicating Title IX complaints, many schools have gone even further than OCR's specific directives in adopting procedures favoring alleged victims (the great majority of whom are female) and essentially eliminating fair process protections for respondents (the great majority of whom are male).

253.    Following the model of the federally-funded "Start by Believing" campaign, schools routinely train their officials to apply trauma-informed and "#BelieveWomen" approaches in ways that lead them to presume that an alleged assault occurred, that a complainant's account of an incident must be true, and that a complainant's subjective impressions determine whether conduct is sexual harassment or assault. Students are suspended or expelled without meaningful notice or opportunity to be heard and are left with records that permanently brand them as sexual offenders, devastate them personally, and severely impact their educational and career opportunities.

254.    The same kinds of training and guidance go to other members of the college community, and in this age of social media and the internet, the mere mention of a sexual misconduct accusation can have the same negative and ongoing effects as a finding of responsibility, even if the accused is exonerated.

255.    "Because the changes to the process were impelled in large part by the federal government, the issues presented [in any particular case] are not entirely unique, and not confined to a single campus." *Brandeis*, 177 F. Supp. 3d at 572.

256.    Numerous groups and organizations have spoken out against the legal and financial pressure exerted by OCR to force colleges and universities to find students accused of sexual misconduct (who are overwhelmingly male) responsible, in spite of the evidence or the lack of evidence.  (*See, e.g.*, Foundation for Individual Freedom in Higher Education (FIRE), Stop Abusive and Violent Environments (SAVE), Families Advocating for Campus Equality (FACE), and prominent Harvard and University of Pennsylvania Law School faculty members asserting that OCR's new rules violate the due process rights of the accused.)

257.    In the words of a judge considering college disciplinary procedures that "appear[] to have substantially impaired, if not eliminated, an accused student's right to a fair and impartial process:" "it is not enough simply to say that such changes are appropriate because victims of sexual assault have not always achieved justice in the past. Whether someone is a 'victim' is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning. Each case must be decided on its own merits, according to its own facts. If a college student is to be marked for life as a sexual predator, it is reasonable to require that he be provided a fair opportunity to defend himself and an impartial arbiter to make that decision. Put simply, a fair determination of the facts requires a fair process, not tilted to favor a particular outcome, and a fair and neutral fact-finder, not predisposed to reach a particular conclusion." *Brandeis*, 177 F. Supp. 3d at 573.

258.    Other federal and state courts, as well as some state legislators and university officials, have similarly expressed concerns that efforts to redress longstanding social problems are resulting in unfair processes and results in individual Title IX proceedings.

259.    On September 3, 2014, NPR published an article titled, "Some Accused Of Sexual Assault On Campus Say System Works Against Them." Here, the University of Maine's Dean Robert Dana recognized that federal pressure made universities rush to judgment on individual allegations, stating, "I expect that that can't help but be true. Colleges and universities are getting very jittery about it." https://www.npr.org/2014/09/03/345312997/some-accused-of-campus-assault-say-the-system-works-against-them#:~:text=this%20one!'-,%22,getting%20very%20jittery%20about%20it.%22

260.    In reminiscing about the pressure applied to colleges and universities under the Obama administration, former Office of Civil Rights lawyer Jackie Gharapour admitted, "We did see some bad cases in the Obama era, cases where it basically didn't matter what evidence there was. The college was going to find against the defendant, the male defendant, no matter what. I think the schools felt pressure under the Obama guidance." https://www.realclearinvestigations.com/articles/2020/12/15/bidens_pushing_ahead_to_the_obama_past_on_campus_rape_hell_need_good_luck_with_that_126353.html?fbclid=IwAR229kxedzNe_pkf7AiQOAmv1XX8O3SMPPs93RFq1wDodqLnudEIqRUc2ow

261.    Similarly, Association of Title IX Administrators ("ATIXA") president, Brett Sokolow recalled that, "the problem of biased outcomes was real. Educational institutions railroaded those accused of sexual violence and harassment (mostly cisgender men) in numbers that        should        terrify        any        reasonable        person."

https://www.insidehighered.com/views/2022/07/12/flexibility-title-ix-regs-blessing-and-curse-opinion.

**C. Starting in 2017, the Department of Education has modified its approach to Title IX enforcement, focusing on fairness to all parties.**

262.    In guidance documents issued on September 22, 2017, the Department of Education expressed concern that many schools have established procedures for resolving allegations that "'lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation.'" Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. A Q&A on Campus Sexual Misconduct, which the Department adopted the same day, provided guidance on procedural protections necessary for a fair, reliable process. 2017 Q&A, https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

263.    On November 29, 2018, the Department published new proposed regulations for public review and comment. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, https://www.federalregister.gov/documents/2018/11/29/2018-25314/nondiscrimination-on-the-basis-of-sex-in-education-programs-or-activities-receiving-federal.

264.    The proposed regulations represented the Department's effort to align Title IX regulatory requirements with basic principles of justice and court rulings requiring that people accused of serious misconduct receive notice, a fair hearing before unbiased decision makers, and a presumption of innocence. *Id*.

265.    The proposed regulations set forth specific procedural protections including:

   a.   Provisions requiring schools to provide adequate notice of allegations and their applicable procedures, conduct full and fair investigations, collect, and

67

objectively evaluate both exculpatory and inculpatory evidence, create investigative reports that fairly summarize relevant evidence, provide fair hearings in front of unbiased decisionmakers (who cannot be the same people as the investigator(s)), and give respondents a presumption of non-responsibility.

b.  Provisions requiring schools to allow both parties to review all the evidence related to the allegations (not just evidence the school considers relevant or intends to rely on), so that the parties can meaningfully respond to the evidence before the investigation concludes.

c.  Provisions requiring schools to train officials to conduct impartial proceedings, not to rely on sex stereotypes, and not to base credibility decisions on a party's status as complainant or respondent.

d.  Provisions requiring colleges and universities to provide a live hearing and allow advisors to the parties to cross-examine the other party and witnesses.

266.    The proposed regulations confirmed that "[a school's] treatment of a complainant in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under Title IX" and that "[a school's] treatment of the respondent may also constitute discrimination on the basis of sex under Title IX." Proposed 34 C.F.R. § 106.45.

267.    On May 7, 2020, the Department of Education announced the final Title IX regulations. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance* (to be published in the Federal Register; unofficial text available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-regs-unofficial.pdf).

268.    Under the final regulations: "A recipient's response must treat complainants and respondents equitably by offering supportive measures as defined in § 106.30 to a complainant, and by following a grievance process that complies with § 106.45 before the imposition of any disciplinary sanctions or other actions that are not supportive measures as defined in § 106.30, against a respondent." 34 C.F.R. § 106.44(a), as amended.

269.    Section 106.45(b) sets forth the specific requirements for a formal grievance process.

270.    The Department repeatedly emphasized that the protections it mandated are rooted in longstanding principles of due process and fundamental fairness and apply to both private and public institutions. "[A]s the Department has recognized in guidance for nearly 20 years, Title IX rights must be interpreted consistent with due process guarantees." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, Supplementary Information, at 276.

271.    Section 106.45(a) confirms that a school's "treatment of a complainant or a respondent in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under title IX."

272.    As the Department explained: "In every case in which Title IX sexual harassment is alleged, the facts must be resolved accurately to further the non-discrimination mandate of Title IX, including providing remedies to victims and ensuring that no party is treated differently based on sex. . . . The [regulatory] grievance process aims to provide both parties with equal rights and opportunities to participate in the process, and to promote impartiality without favor to complainants or respondents, both because treating a complainant or respondent differently based on sex would violate Title IX, and because a process lacking principles of due process

69

risks bias that in the context of sexual harassment allegations is likely to involve bias based on stereotypes and generalizations on the basis of sex." Supplementary Information, at 220, 277.

### D. Towson University's Response to the Proposed 2020 Regulations.

273.     On September 18, 2017, after new Title IX guidance was released, an article was published in The Towerlight, Towson's campus and community news source. The article was titled, "Schatzel responds to Title IX reforms." In the article, Towson University President Kim Schatzel was quoted. Specifically, in a statement, Schatzel declared that "Towson University remains committed to preventing sexual assault and misconduct, **and supporting survivors of sexual assault** as part of Title IX procedures." (Emphasis added). Additionally, Schatzel stated, "Our intention is to be able to provide the most complete protection and advocacy, as well as support around [Title IX]. Going forward, we're not looking at backing off at all." https://thetowerlight.com/schatzel-responds-to-title-ix-reforms/

274.     On October 2, 2017, after new Title IX guidance was released, an article was published in The Towerlight, Towson's campus and community news source. The article was titled, "Towson reacts to new federal Title IX guidance." In the article, Towson's Sexual Violence Prevention Educator, Kailah Carden was interviewed and quoted. In the article, Carden made her belief known that she is a proponent of the 2011 Dear Colleague letter, the same letter that has been routinely criticized for being discriminatory against males. Specifically, she remarked, "There's been a lot of progress since 2011's Dear Colleague and even though that guidance has been withdrawn, we are hopeful that our school and other schools around the country can really keep protections for survivors in place so that we don't move backwards as a campus community and just nationally." https://thetowerlight.com/towson-reacts-to-new-federal-guidances-to-title-ix/

275.   On January 30, 2019, the University submitted comments on the Notice of Proposed Rulemaking outlining changes to the regulations under Title IX.

276.   Through these comments, the University made its goal of protecting female survivors, discriminating against males, and stripping accused students of their due process rights well known.

277.   Regarding the proposal that required post-secondary institutions to have a live-hearing with cross examination, the University stated, "The proposed requirement relating to a live hearing with cross-examination will result in fewer victims of sexual harassment and assault making reports to institutions, and are inappropriate to the type of adjudication process used by higher education institutions to determine a student's responsibility for conduct violations. Regulations should not require live hearings. An option other than a live hearing is important for cases where there may be reluctant complainants. Additionally, there are instances where the school itself initiates an investigation or administrative review into particularly concerning behavior even if the victims do not want to participate. The requirement of a live hearing with cross-examination will strip the institution of its ability address policy violations absent a participating victim."

278.   By opposing the live-hearing and cross-examination requirements because the University is worried about reluctant complainants, the University made it apparent its primary concern is protecting alleged survivors, not finding the truth.

279.   Regarding the proposed definition of "formal complaint," the University stated, The proposed definition of "formal complaint" is contrary to the spirit and purpose of Title IX as it fails to address incidents of sexual misconduct that occur outside of school sponsored programs or activities but have continuing effects on campus or within an education program or

activity. Additionally, the requirement that institutions dismiss complaints of harassment or assault that occurs outside the United States ignores the reality that these problems occur in study abroad programs, and need to be addressed."

280.    Regarding the proposal prohibiting institutions from using the Title IX process unless the complainant has alleged he/she has been effectively denied equal access to the recipient's education program or activity, the University argued that such a prohibition is "inconsistent with the requirement that institutions implement supportive measures to prevent such denial from occurring."

281.    The University further argued that, "The proposed definition that sexual harassment be "severe, pervasive, AND objectively offensive" is too narrow. It is inconsistent with other federal and state laws and it fails to protect individuals from behavior that would constitute discrimination on the basis of sex prohibited by Title IX."

282.    As part of its comment, the University also stated, "Title IX of the Education Amendments of 1972 was enacted to respond to discrimination against students in schools and colleges. Towson University has taken great strides in eliminating sex discrimination on our campus. And while progress has been made, there is much more work to do. We believe that some of these proposed provisions will present barriers to our prevention efforts and will make it more difficult to respond to students who believe they have been subjected to sexual harassment or assault."

283.    In addition to the University as an institution issuing comments on the proposed rule, Michael Wenger, Residence Life Coordinator, also issued a comment. Specifically, he highlighted the opinion of the regulations on Towson's campus. Specifically, he wrote, "I am concerned about how hard it will be to hold rapists, sexual predators, and starters of sexual

violence accountable under the new definitions. By passing these reforms, you are taking students' lives, already heavily and negatively impacted by their surviving of sexual assault, and telling them to their faces, "I do not care about you." I am also concerned at the pressure and weight this puts on Title IX offices across the country, as the professional staff working at our institutions now have to tell victims, "Sorry, the federal government is forcing me to not care or process your sexual assault." The new DeVos Definitions, which is what I will forever be calling them, if passed, scare me and the many students I advocate for and serve. If enacted this rule would completely destroy the lives of those affected by rape and sexual assault, make it harder for universities to do our job, and permanently classify Betsy DeVos as being Pro Rape and Pro Choice. Pro Choice, in regards to sexual violence, means that Betsy DeVos is ok with choosing whether or not to advocate for students and hold rapists accountable."

284.    Through these comments, the University and its staff made clear that Defendants seek to have a process that gives the University more latitude to protect survivors, who are overwhelmingly female, and punish the accused, who are overwhelmingly male.

**E.  Pro-victim bias violates Title IX**

285.    Since cases involving alleged sexual misconduct on college campuses overwhelmingly arise from a woman accusing a man, measures that are put in place to protect alleged victims and punish alleged perpetrators necessarily result in harsher treatment of men.

286.    Indeed, as noted above, efforts to provide more protections to reported victims of sexual misconduct have consistently focused on protection of women.

287.    As the new Title IX regulations confirm, any approach under which accused people are presumed guilty or deprived of the ability to defend themselves, or individual cases are resolved without full and fair consideration of the facts of each case, is contrary to this

nation's fundamental principles and contrary to Title IX and the Clery Act's requirements of a "prompt, fair, and impartial investigation and resolution." 20 U.S.C. § 1092(f)(8)(B)(iv)(I)(aa); *see also* 34 C.F.R. 106.8(b) and 45 C.F.R. § 86.8(b) (quoted above).

288.   Justice Ruth Bader Ginsburg has been credited with noting that, fair process for the accused "must not be ignored and it goes beyond sexual harassment. The person who is accused has a right to defend herself or himself, and we certainly should not lose sight of that. Recognizing that these are complaints that should be heard. There's been criticism of some college codes of conduct for not giving the accused person a fair opportunity to be heard, and that's one of the basic tenets of our system, as you know, everyone deserves a fair hearing." Asked how to "balance the values of due process against the need for increased gender equality," Justice Ginsburg replied: "It's not one or the other. It's both. We have a system of justice where people who are accused get due process, so it's just applying to this field what we have applied generally." Jeffrey Rosen, *Ruth Bader Ginsburg Opens Up About #MeToo, Voting Rights, and Millennials*, The Atlantic (Feb. 15, 2018), https://www.theatlantic.com/politics/archive/2018/02/ruth-bader-ginsburg-opens-upabout-metoo-voting-rights-and-millenials/553409/.

289.   The belief that measures to protect reported victims are generally equated with protection of women, and measures to ensure a fair process for respondents are generally equated with protection of men, has been starkly confirmed by responses to the Department of Education's 2017 guidance and its proposal in 2018 to amend Title IX regulations to ensure a fair process for both complainants and respondents.

290.   Over 100,000 comments were filed to the proposed regulations, with a common theme being allegations that the Department's efforts to restore fair processes in campus

disciplinary proceedings were motivated by bias against women and disproportionately burden women.

291.    To avoid gender discrimination, campus disciplinary proceedings should be fundamentally fair to all participants: complainants and respondents, regardless of sex.

**F. Both on their face and as applied, Towson University's policies and procedures violate Title IX.**

292.    Both on their face and as applied in this case, Towson University's policies and procedures for handling allegations of sexual misconduct violated Title IX. Towson reached an erroneous outcome, selectively enforced its disciplinary procedures, applied archaic assumptions, all based on Plaintiff's gender. Among other things, as set forth above, Towson University:

    a.  Ignored and misapplied its own Policy and procedures based on Plaintiff's gender;

    b.  Reached a result-driven determination rather than reaching a decision based on a preponderance of all relevant evidence;

    c.  Made credibility determinations against Plaintiff and in favor of Ms. Roe that were not rationally based on the evidence;

    d.  Failed to question Ms. Roe's credibility in light of her decision not to participate in the process and in light of documented evidence produced by Plaintiff which demonstrated that Ms. Roe was not being truthful and/or accurate;

    e.  Selected evidence to support Ms. Roe's narrative while ignoring evidence of her inconsistencies and false statements;

    f.  Failed to interview relevant witnesses, including Ms. Roe's ex-boyfriend who opined that Ms. Roe engaged in consensual sex with Plaintiff;

g.  Willfully ignored Ms. Roe's strange behavior, who despite claiming to be uncomfortable around Plaintiff and was safely tucked away at home, willingly decided to go back to his apartment;

h.  Made improper decisions regarding relevancy, allowing M.D. to give a victim-impact statement on behalf of Ms. Roe;

i.  Impaneling a partial and bias Panel, who was committed to finding Plaintiff responsible under any means necessary, the most egregious example being Dario DiBattista; and

j.  Failing to train its officials to handle sexual assault allegations fairly and impartially.

293.  Towson University fosters a campus community that encourages students, staff, and officials to "Start by Believing" and promotes the belief that only females are victims of sexual misconduct and only males are perpetrators of sexual misconduct.

294.  The University's process is not intended to treat complainants and respondents equally, or to fairly investigate and adjudicate complaints. The University's process is intended to protect and support survivors. The University reaches the goal of responding in a manner designed to eliminate the misconduct by arbitrarily finding male respondents, like Plaintiff, responsible for violations and removing them from campus.

295.  Towson University's discriminatory and one-side process deprived Plaintiff, as a male student, of educational opportunities on the basis of sex.

296.  Plaintiff's case is part of a pattern and practice of Title IX violations and discrimination against male students accuse of sexual misconduct.

297.    Information concerning sexual misconduct complaints at Towson University and the outcome of disciplinary proceedings involving male students compared to female students is in Towson's exclusive possession and control. Upon information and belief, statistics within Towson's exclusive possession and control will show a pattern of intentional discriminatory conduct, erroneous outcomes, archaic assumptions, and selective enforcement based on gender.

298.    Upon information and belief, statistics within University's exclusive possession and control will show that students accused of sexual misconduct are overwhelmingly male, and that male students accused of sexual misconduct are overwhelmingly found responsible.

299.    Upon information and belief, statistics within University's exclusive possession and control will show that female students accused of serious sexual or non-sexual misconduct are treated more favorably than male students in general.

300.    As a direct, proximate, and foreseeable consequence of Defendants' violations of Title IX, Plaintiff sustained significant damages, including, but not limited to, damages to reputation, loss of educational opportunities, loss of career opportunities, loss of future career prospects, economic injuries, and other direct and consequential damages.

301.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT II

**Violation of the Due Process Clause of the 14th Amendment to the United States Constitution, Pursuant to 42 U.S.C. §§ 1983, 1985, 1988 (Against Defendants Bradley, Peer, Woody, DiBattista, Arrington, and John Roes 1-5, in their official capacities for injunctive relief[3])**

302.    Plaintiff repeats and realleges each and every allegation set forth above as if fully rewritten herein.

303.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property without due process of law."

304.    A person has a protected liberty interest in pursuing his education as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

305.    Plaintiff's constitutionally protected property interest in his degree, which he relies upon for his employment, are to be free from arbitrary dismissal arising from the policies, courses of conduct, practices, and process set forth by Towson University.

306.    Plaintiff's constitutionally protected property interest in his degree and his employment arise from the express and implied contractual relationship between Towson University and Plaintiff.

307.    The Fourteenth Amendment due process protections are required in the higher education disciplinary proceedings such as at Towson University.

---

[3] Defendants Bradley, Peer, Woody, DiBattista, Arrington, and John Roes 1-5 are being sued in all Counts in their official capacities for injunctive relief. Defendants Bradley, Peer, Woody, DiBattista, Arrington, and John Roes 1-5 are being sued in their individual capacities for monetary damages.

308.    Thus, a person who has been admitted to a public university, and has paid tuition to that university, has a protected property interest in the degree earned through coursework and the payment of tuition. The State cannot deprive a person of this interest without due process.

309.    As a result, Plaintiff, who was subjected to disciplinary action that included the possibility of suspension or dismissal, if found responsible, is entitled to the due process protections of the Fourteenth Amendment to the United States Constitution.

310.    Defendants have an absolute duty to provide its students with equal protection and due process of law by and through any and all policies and procedures set forth by the University.

311.    Plaintiff has been maintaining satisfactory academic marks, abided by his financial obligations to the University and had obeyed the University's polices when he was dismissed from the University.

312.    Under both federal and state law, Plaintiff had a constitutionally protected property interest in his degree.

313.    Plaintiff was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations in this matter resulted in a sanction that will have lifelong ramifications for Plaintiff, including loss of future wages.

314.    Plaintiff was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct involving Jane Roe.

315.    In the course of its investigation and hearing process, Defendants knowingly, flagrantly, willfully, and maliciously violated Plaintiff's clearly established rights under the Due

Process Clause of the Fourteenth Amendment through the Defendants' repeated acts of deprivation of the minimal requirements of procedural fairness.

316.    Defendants deprived Plaintiff of his liberty and property interests without affording him basic due process, including but not limited to, his right to a fair and impartial adjudication, his right to a meaningful opportunity to be heard by those making the decision on credibility and ultimately responsibility, and his right to confront his accuser by way of cross-examination. Rather than provide a fundamentally fair process, Defendants conducted a result driven process aimed at finding men responsible of sexual misconduct.

317.    Based on the general bias expressed throughout the University and by the hearing panel, as well as implicit in its policies and procedures, Defendants subjected Plaintiff to an insufficient process when it failed to provide Plaintiff with a fair and reasonable opportunity to defend himself and arrived at a predetermined, arbitrary, and unwarranted decision.

318.    As a result, Defendants failed to provide Plaintiff with the basic due process protections that Defendants are required to provide students accused of sexual misconduct and faced with a possible sanction of suspension and/or dismissal.

319.    Defendants were acting under the color of the law when they showed intentional, outrageous, willful, and reckless disregard for Plaintiff's constitutional rights.

320.    Defendant Towson, as well as its agents, representatives, and employees agreed to, approved, and ratified this unconstitutional conduct.

321.    As a result of these due process violations, Plaintiff continued to suffer ongoing harm, including damages to his reputation, loss of his degree, eventual loss of employment, and other non-economic and economic damages.

322.     As a direct and proximate cause of Defendants' actions, Plaintiff suffered tremendous damage to his person and reputation, including without limitation, emotional distress, loss of future employment, and a significantly lower probability of being admitted to another university, economic damages, and other direct and consequential damages.

323.     Plaintiff is entitled to injunctive relief as a result of the deprivation of his due process and equal protection rights. Preliminary injunction should return the status quo before the controversy at issue, with Plaintiff being a student in good standing.

324.     Further, injunctive relief to provide Plaintiff with a fair and equitable student disciplinary process conforming with his due process and equal protection rights is proper. Plaintiff is entitled to have a hearing affording him his rights under the law. In contrast, the University can have no legitimate interest in failing to provide a fair, equitable, and impartial hearing, conforming to the law and the rights that are afforded to persons under the law.

## COUNT III

**Violation of the Due Process Clause of the 14th Amendment to the United States Constitution, Pursuant to 42 U.S.C. §§ 1983, 1985, 1988 (Against Defendants Bradley, Peer, Woody, DiBattista, Arrington, and John Roes 1-5, in their individual capacities for monetary damages)**

325.     Plaintiff repeats and realleges each and every allegation set forth above as if fully rewritten herein.

326.     As discussed in Paragraphs 302-319 Defendants Bradley, Peer, Woody, DiBattista, Arrington, and John Roes 1-5 violated Plaintiff's rights under the Fourteenth Amendment to the United States Constitution.

327.     As a direct, proximate, and foreseeable consequence of Defendants' violations of the Fourteenth Amendment, Plaintiff sustained significant damages, including, but not limited

to, damages to reputation, loss of educational opportunities, loss of career opportunities, loss of future career prospects, economic injuries, and other direct and consequential damages.

328.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT IV[4]

### Violation of Due Process Clauses of the Maryland Declaration of Rights
### (Against All Defendants)

329.     Plaintiff repeats and realleges each and every allegation set forth above as if fully rewritten herein.

330.     Under Article 19 of the Maryland Declaration of Rights, "That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the Land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the Land."

331.     Under Article 24 of the Maryland Declaration of Rights, "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

---

[4] The allegations in Counts IV-VI, VIII (State Constitutional Claims and Negligence) are made in the alternative against the individual Defendants for acts involving malice or gross negligence, or, alternatively against Towson University. Md. Cts. & Jud. Proc. Code § 5-522 provides that the immunity of the State of Maryland is not waived under Md. State Gov. Code §§ 12-101, *et seq.* (The Maryland Tort Claims Act") for the tortious acts and omissions of State personnel acting within the scope of their public duties, or made with malice or gross negligence. The State, however, does waive immunity for up to $400,000.00 in damages, for tortious acts or omissions of its personnel committed within the scope of their duties not committed with malice or gross negligence. Either the individual defendants are liable or Towson University is liable. Pursuant to the Torts Claim Act, notice was properly sent on or about November 10, 2023. A copy of the notice letter is attached hereto as *Exhibit P.*

332.     These due process clauses of the Maryland Constitution provide protection to Plaintiff as to his rights consistent, if not greater, than the rights afforded to him under the due process clause of the United States Constitution.

333.     In depriving Plaintiff of his constitutionally protected rights, as described above, including his liberty interest in his good name, reputation, honor and integrity, opportunity to pursue education and employment; and his property interest in his education, Defendants violated Plaintiff's right to due process of law in violation of Article 19 and Article 24 of the Maryland Declaration of Rights.

334.     Defendants deprived Plaintiff of these constitutional rights by failing to afford him basic due process, including but not limited to, his right to a fair and impartial adjudication, his right to a meaningful opportunity to be heard by those making the decision on credibility and ultimately responsibility, and his right to confront his accuser by way of cross-examination. Rather than provide a fundamentally fair process, Defendants conducted a result driven process aimed at finding men responsible of sexual misconduct.

335.     Defendants had a duty to provide due process of law as required by the Maryland Constitution in the disciplinary process to which Plaintiff was subjected to.

336.     Defendants Bradley, Peer, Woody, DiBattista, Arrington, and John Roes 1-5, in the course of their duties and in concert with one another, by their conduct, showed intentional outrageous, and reckless disregard for Plaintiff's constitutional rights.

337.     Said Defendants acted with malice and/or gross negligence in depriving Plaintiff of his constitutional rights.

338.     Alternatively, said Defendants acted with negligence and violated their duty of due care when they deprived Plaintiff of his rights, guaranteed to him under the Maryland Constitution without due process of law.

339.     As a direct and proximate result of Defendants' unlawful actions, Plaintiff suffered tremendous damage to his person and reputation, including without limitation, emotional distress, loss of future employment, and a significantly lower probability of being admitted to another university, economic damages, and other direct and consequential damages.

## COUNT V

### Violation of Equal Protection Clause of Maryland Declaration of Rights
### (Against All Defendants)

340.     Plaintiff repeats and realleges each and every allegation set forth above as if fully rewritten herein.

341.     Although it is not explicitly stated, Article 24 of the Maryland Declaration of Rights guarantees to the people of Maryland, equal protection of the law.

342.     Maryland's Equal Protection rights found in the due process clauses of the Maryland Constitution provide protection to Plaintiff as to his rights consistent, if not greater, than the rights afforded to him under the Equal Protection Clause of the United States Constitution.

343.     As discussed throughout this Complaint, Defendants denied Plaintiff equal protection of the law when Defendants treated him substantially different than Ms. Roe. This differential treatment was based solely on Plaintiff's sex.

344.     Defendants acted with malice and/or gross negligence in depriving Plaintiffs of his rights discussed herein.

345.     Alternatively, Defendants acted with negligence, and violated their duty of due care when they deprived Plaintiff of equal protection of the law, as guaranteed under the Maryland Constitution.

346.     As a direct and proximate cause of Defendants' unlawful actions, Plaintiff suffered tremendous damages to his person and reputation, including without limitation, emotional distress, loss of future employment, and a significantly lower probability of being admitted to another university, economic damages, and other direct and consequential damages.

## COUNT VI

### Violation of Equal Rights Amendment of Maryland Declaration of Rights
### (Against All Defendants)

347.     Plaintiff repeats and realleges each and every allegation set forth above as if fully rewritten herein.

348.     Article 46 of the Maryland Declaration of Rights, the State Equal Rights Amendment, provides, "Equality of rights under the law shall not be abridged or denied because of sex."

349.     As aforementioned and as discussed throughout this Complaint, Towson's Policies, both on its face and as applied to Plaintiff were intended to cause adverse and unequal impact on male students, such as Plaintiff, as opposed to female students.

350.     The Policies and Procedures implemented by Defendants had an adverse impact and discriminated against Plaintiff based on his male sex.

351.     Defendants acted with malice and/or gross negligence in depriving Plaintiff of his rights discussed herein.

352.     Alternatively, Defendants acted with negligence, and violated their duty of care when they deprived Plaintiff of equal protection of the law, as guaranteed under the Maryland Constitution.

353.     As a direct and proximate cause of Defendants' unlawful actions, Plaintiff suffered tremendous damages to his person and reputation, including without limitation, emotional distress, loss of future employment, and a significantly lower probability of being admitted to another university, economic damages, and other direct and consequential damages.

## COUNT VII

**Breach of Contract**
**(Against Towson University)**

354.     Plaintiff repeats and realleges each and every allegation set forth above as if fully rewritten herein.

355.     At all relevant times, a contractual relationship existed between Plaintiff and Towson University.

356.     The promises contained in Towson University's Code of Conduct and Policies are legally binding obligations.

357.     Defendants were required to act in accordance with the University's written policies and procedures in investigating and adjudicating reports of alleged violations of the Policy.

358.     Based on the facts and circumstances set forth in this Complaint, Defendants materially breached its express and/or implied agreements with Plaintiff by failing to comply with its obligations, standards, policies, and procedures in the course of the disciplinary proceedings against Plaintiff, and by subjecting him to fundamentally unfair processes.

359.    In its Policy and Handbook, Towson University promises, among other things, that it will:

  a.  Objectively evaluate evidence;

  b.  Conduct a prompt, thorough, fair, and impartial investigation;

  c.  Attempt to interview all relevant witnesses;

  d.  Appoint panel members who are free of conflicts of interest or bias;

  e.  Prohibit irrelevant evidence from being presented at the hearing, including character evidence;

  f.  Use the preponderance of the evidence standard when determining responsibility; and

  g.  Correct any errors in the investigation and/or adjudication process through an appeal.

360.    Defendants materially breached its obligations when, among other things, it:

  a.  Allowed M.D. to admit into the record irrelevant "victim-impact" statements;

  b.  Failed to explore any of Ms. Roe's strange behavior, the inconsistencies in her narrative, and her decisions to willfully omit relevant evidence;

  c.  Failed to interview all relevant witnesses, thus failing to conduct a fair and thorough investigation;

  d.  Allowed bias individuals to serve on the panel;

  e.  Allowed these bias panel members to criticize Plaintiff for actions that were not alleged policy violations and were not relevant to any determination at issue;

  f.  Shifting the burden of proof onto Plaintiff;

g. Failed to use the preponderance of the evidence standard, and instead relied on a result-driven process to make baseless decisions related to Plaintiff's responsibility;

h. Ignored relevant evidence which casted serious doubt on Ms. Roe and M.D.'s credibility, and instead made irrational and arbitrary determinations regarding credibility, all of which were in favor of Ms. Roe and against Plaintiff; and

i. Failed to correct the material errors in the process on appeal.

361. Plaintiff fully complied with his contractual obligations to Towson University.

362. As a direct, proximate, and foreseeable consequence of Defendants' breach of its express and/or implied contractual obligations, Plaintiff sustained significant damages, including, without limitation, damage to reputation, loss of educational opportunities, loss of career opportunities, loss of future career prospects, economic injuries, and other direct and consequential damages.

363. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

**COUNT VIII**
**Negligence**
**(Against Towson University)**

364. Plaintiff repeats and realleges each and every allegation set forth above as if fully rewritten herein.

365. Defendant Towson and its employees had a duty of reasonable care in the implementation of Towson's Sexual Misconduct policies and procedures.

366.     As stated throughout this Complaint, Defendants breached their obligations to Plaintiff in carrying out Towson's policies in an unfair and biased manner, causing harm to the Plaintiff.

367.     Defendants acted with malice and/or gross negligence in failing to use reasonable care in creating and implementing Towson's policies, both on its face and as applied to Plaintiff, as previously stated throughout this Complaint.

368.     Alternatively, Defendants acted with negligence, and violated their duty of due care in implementing Towson's policies, as previously started throughout this Complaint.

369.     As a direct, proximate, and foreseeable consequence of Defendants' breach of its express and/or implied contractual obligations, Plaintiff sustained significant damages, including, without limitation, damage to reputation, loss of educational opportunities, loss of career opportunities, loss of future career prospects, economic injuries, and other direct and consequential damages.

370.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### COUNT IX
### Injunctive Relief
**(Against Towson University and Defendants Bradley, Peer, Woody, DiBattista, Arrington, and John Roes 1-5, in their official capacities)**

371.     Plaintiff repeats and realleges each and every allegation set forth above as if fully restated herein.

372.     Defendants committed numerous violations of Plaintiff's rights as set forth herein, under both the Maryland Declaration of Rights as well as the United States Constitution.

373.   Plaintiff's future educational and career prospects have been severely damaged. Without appropriate redress, the erroneous outcome will continue to cause irreversible and irreparable damages to Plaintiff and his educational and employment prospects, in perpetuity.

374.   In failing to implement adhere to Towson's policies, and stripping Plaintiff of his rights under the Maryland and United States Constitutions, Plaintiff was wrongfully suspended from Towson University and was branded with a notation on his permanent record that he was found responsible for sexual misconduct.

375.   As a direct, proximate, and foreseeable consequence of Defendants' breach of its express and/or implied contractual obligations, Plaintiff sustained significant damages, including, without limitation, damage to reputation, loss of educational opportunities, loss of career opportunities, loss of future career prospects, economic injuries, and other direct and consequential damages.

376.   As a result of the foregoing, Plaintiff is entitled to a permanent injunction, enjoining Towson University from instituting, proceeding with or maintaining the instant sexual misconduct adjudication and/or sanction against Plaintiff.

### COUNT X

**Declaratory Judgment**
**(Against All Defendants)**

377.   Plaintiff repeats and realleges each and every allegation set forth above as if fully rewritten herein.

378.   Defendants committed numerous violations of Plaintiff's rights as set forth herein.

379.   Plaintiff's future educational and career prospects have been severely damaged. Without appropriate redress, the erroneous outcome will continue to cause irreversible and irreparable damages to Plaintiff and his educational and employment prospects, in perpetuity.

380.    As a result of the foregoing, there exists a justiciable controversy between the Plaintiff and Defendant with respect to the outcome, permanency, and future handling of Plaintiff's formal student record at the University.

381.    Therefore, Plaintiff respectfully requests that this Honorable Court, pursuant to 28 U.S.C. §2201, declare that: (i) the outcome and findings made by Defendant relating to the allegations set forth by Jane Roe should be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged and sealed; (iv) any record of Plaintiff's dismissal from the University be removed from his educational file; (v) any record of Jane Roe's complaint against Plaintiff be permanently destroyed; (vi) Plaintiff be reinstated to the University as a student in good academic standing; (vii) University's rules, regulations and guidelines relating to the adjudication of allegations of sexual misconduct are unconstitutional as applied.

## COUNT XI

### Declaratory Judgment
### (Against All Defendants)

382.    Plaintiff repeats and realleges each and every allegation set forth above as if fully rewritten herein.

383.    Based on the foregoing, Towson University created expressed and implied contracts when Plaintiff accepted an offer of admission, paid the required tuition and fees, and fully complied with the policies of the University. In exchange for Plaintiff's performance of his contractual obligation, the University agreed to provide enrollment in its program, confer a degree upon its completion, and to conduct itself in accordance with its written policies and procedures.

384.    Defendant breached its express and/or implied contract with Plaintiff by failing to follow the University's written policies and procedures, including but not limited to the following:

      a.   University policies and procedures promised that all disciplinary decisions will be based on an objective evaluation of evidence. No disciplinary decisions, including credibility determinations, will be based on a person's status as a complainant, respondent, or witness or on a person's membership in a protected class as listed in the university's Nondiscrimination Policy.

      b.   Defendants promised that its policies and procedures will be applied fairly and equally, regardless of the persons' gender.

      c.   Defendants deprived Plaintiff of the opportunity to defend himself in a fair and impartial investigation and/or hearing.

      d.   Instead, Defendants employed a result-driven process aimed at finding male students, such as Plaintiff, responsible of sexual misconduct.

385.    Defendants violated Plaintiff's fundamental right to liberty in his good name, reputation and employment without a fair and just process and in violation of his Due Process rights.

386.    Therefore, Defendants breached the contract with Plaintiff when it failed to afford him a proper investigation and hearing on the charges before him and dismissing him from the University.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury of all issues triable by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons, John Doe respectfully requests that this

Honorable Court:

(a)  Order Towson University to reverse and expunge its findings of responsibility and sanction of expulsion from Plaintiff's education record;

(b)  Order Towson University to provide a Dean's Certification that shall be made available to third parties (such as educational institutions and prospective employers) certifying that it has reversed and expunged the findings and sanction;

(c)  Award Plaintiff compensatory and punitive damages in an amount to be determined at trial, including, without limitation, damage to reputation, loss of educational opportunities, loss of career opportunities, loss of future career prospects, economic injuries, and other direct and consequential damages;

(d)  Award prejudgment interest;

(e)  Award attorneys' fees and costs pursuant to statutory or common law doctrines providing for such award; and

(f)  Grant such other and further relief that the Court deems just and proper.

Respectfully Submitted

/s/ Ronald L. Schwartz
RONALD L. SCHWARTZ (07159)
4907 Niagara Road, Suite 103
College Park, Maryland 20740
P: (301) 474-2300
E: ronaldschwartz@verizon.net

/s/ Eric F. Long
ERIC F. LONG (OH #0093197)
TYLER J. WALCHANOWICZ (OH # 0100115)
*Pending Pro Hac Vice Admission*
Friedman Nemecek & Long, L.L.C.
1360 East 9th Street, Suite 650
Cleveland, OH 44114
P: (216) 928-7700
F: (216) 820-4659
E: efl@fanlegal.com
E: tjw@fanlegal.com